# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
April 4, 2012 Session

## STATE OF TENNESSEE v. GUY ALVIN WILLIAMSON

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Tipton County**
**No. 6572      Joseph H. Walker, Judge**

---

**No. W2011-00049-SC-R11-CD - Filed May 31, 2012**

---

After an investigatory stop and frisk, the defendant was charged with the unlawful possession of a handgun after a felony conviction and the unlawful possession of a handgun while under the influence of alcohol and was convicted on both counts. The trial court imposed probationary sentences of three years and eleven months, twenty-nine days, respectively. The defendant appealed, arguing that his motion to suppress evidence should have been granted. The Court of Criminal Appeals affirmed. This Court granted the defendant's application for permission to appeal. Because the investigatory stop and frisk of the defendant was not supported by specific and articulable facts establishing reasonable suspicion that a criminal act was being or about to be committed, the trial court erred by failing to suppress the handgun found by the police and presented as evidence at trial. The judgments of conviction are, therefore, reversed and the cause dismissed.

**Tenn. R. App. P. 11; Judgment of the Trial Court is Reversed and Remanded**

GARY R. WADE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Gary Antrican, District Public Defender; and Parker O. Dixon, Assistant Public Defender, for the appellant, Guy Alvin Williamson.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; David H. Findley, Senior Counsel; D. Michael Dunavant, District Attorney General; and James Walter Freeland, Jr., Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

At 1:25 a.m. on May 31, 2009, officers with the Covington Police Department were dispatched to the Baxter Motel in response to an anonymous 911 telephone call. Six different police officers responded to the dispatch from the department, some going to the second floor, while others remained at the first floor level. Guy Alvin Williamson (the "Defendant") and other individuals were on the second floor balcony near the door to room 21. One officer, who saw a white male leaving room 21, stopped and frisked the individual but found no weapon. Meanwhile, another officer, prompted by an unnamed person at the scene, frisked the Defendant, who was standing three doors away from room 21, and found a .22 caliber Rossi revolver. After observing that the Defendant had slurred speech and smelled of alcohol, the officer placed the Defendant under arrest. Later, a grand jury indicted the Defendant on two counts: (1) the unlawful possession of a handgun after being convicted of a felony, Tenn. Code Ann. § 39-17-1307(c)(1) (Supp. 2008); and (2) the unlawful possession of a handgun while under the influence of alcohol, Tenn. Code Ann. § 39-17-1321(a) (2006).

**Suppression Hearing**

Officer William Nelson, who had driven to the scene in a marked police vehicle and arrived "in a minute or less" after the dispatch, was the only witness at the hearing on the Defendant's motion to suppress the revolver as evidence. On direct examination by the State, he testified that the dispatcher reported "[a]n armed party and possible robbery in progress" at the motel, which, he claimed, was "a place where local prostitutes, addicts, and sellers hang out." Officer Nelson stated that the dispatch included "a possible description of two subjects" and asserted that the Defendant, an African-American, met one of the descriptions provided by the dispatcher. When asked specifically whether the Defendant's clothes matched the description in the dispatch, the officer answered, "Yes, sir." He testified that Michael Short, one of the other five officers at the scene, patted down an individual whose surname was Yarbrough, but found nothing. Yarbrough was later determined to be a guest at the motel. Officer Nelson recalled that Officer Short, one of several officers responding to the anonymous tip, then frisked the Defendant and found a "small revolver" in his right front pocket.[1] He stated that when the weapon was discovered, the Defendant exclaimed, "I don't know whose it is and I don't know how it got there."

On cross-examination, Officer Nelson acknowledged that the arrest warrant he had prepared did not contain any reference to "an armed robbery in progress" and did not include any reference to the description of any suspect from the police dispatch. He explained that he did not include the information regarding a possible robbery in the warrant because he and

---

[1] At trial, Officer Rodney McCurrie testified that he had actually conducted the frisk of the Defendant.

the other officers had been unable to "validate it" at the scene. While conceding that he had not heard the original 911 call to the department and had no knowledge of its content, Officer Nelson nevertheless insisted that the dispatch, his only source of information, was for "an armed robbery in progress." When confronted during his cross-examination with a recording of the dispatch,[2] however, he admitted that the dispatcher did not mention a possible robbery and speculated that he must have received that information from someone after he arrived at the scene. The officer also admitted that the recording of the dispatch did not include a description of the weapon, any information about the ethnicity, gender, or physical appearance of the suspect or suspects, or any reference to the clothing worn. Officer Nelson, who denied drawing his weapon when he arrived at the scene, could not recall whether any of the other officers had done so. There was no testimony at the hearing regarding the Defendant's use of alcohol, although the arrest warrant, which was made an exhibit, included allegations that the Defendant smelled of alcohol and had slurred speech.

Based upon this testimony, the trial court denied the motion to suppress the revolver as evidence. While mistakenly concluding that Officer Nelson had frisked the Defendant when the only testimony was that Officer Short had done so, the trial court ruled that the circumstances warranted an investigatory stop and frisk of the Defendant for possible weapons.

**Trial**

Officer Short testified that he arrived less than a minute after receiving the dispatch. The five others responding to the scene were Officers Garrian, Baskin, Parker, Nelson, and McCurrie. Officer Short recalled that he first patted down a white male walking out of room 21, but found no weapons or contraband. He then checked the inside of the room, which was empty. When he returned to the balcony, he observed Officer McCurrie frisk the Defendant, who was standing three doors away, and saw him remove a .22 caliber Rossi revolver from the Defendant's pocket. Officer Short had no recollection of the Defendant's demeanor or his condition. On cross-examination, he acknowledged that the revolver taken from the Defendant was not capable of firing a bullet, as the trigger was inoperable, the hammer would not fully recoil, and the cylinder did not rotate.

Officer McCurrie, who was employed by the 25th Judicial District Drug Task Force, also responded to the Baxter Motel dispatch. He confirmed that there was no reference in

---

[2] The complete recording of the dispatch is as follows:

> Dispatcher:    3-23-32. Subject with a gun, the Baxter Motel, room number – room 21. Room 21 at Baxter Motel, 112 Highway 51 North. Unable to get further at this time.

the dispatch to a "robbery in progress"—only a report of "an armed party."  When he arrived at the scene and observed that Officer Garrian was pointing his service weapon toward "a subject on the balcony" of the second floor, Officer McCurrie exclaimed, "Aw, man!"  He then saw a white male, who was being questioned by Officer Short, and two black males "standing up there."  After being "nudg[ed]" by an unidentified black male who indicated that the Defendant had a gun, Officer McCurrie walked up the stairs, patted down the Defendant, and found the revolver.  During the search, the officer noticed that the Defendant had "slurred speech," was "loud," and "smelled of alcohol."  On cross-examination, Officer McCurrie acknowledged that the dispatch did not include the race or the gender of the "armed party," although there were no women at the motel when he arrived.

The State also introduced as evidence a certified copy of a judgment dated October 1, 1993, which established that the Defendant had previously been convicted of possession of contraband in a penal institution, Tenn. Code Ann. § 39-16-201(a)(2) (1991), a Class C felony.  The Defendant offered no proof.  After deliberations, the jury returned guilty verdicts for each of the two counts as charged in the indictment.  The trial court imposed probationary sentences of three years for felony possession of a handgun, a Class E felony, and eleven months, twenty-nine days for possession of a handgun while under the influence, a misdemeanor.

**Appeal**

On appeal, the Court of Criminal Appeals affirmed, holding that the investigatory stop and frisk of the Defendant was based upon reasonable suspicion. State v. Williamson, No. W2011-00049-CCA-R3-CD, 2011 WL 3655135, at *4 (Tenn. Crim. App. Aug. 19, 2011). Although finding that the trial court had mistakenly concluded that Officer Nelson, rather than Officer Short or Officer McCurrie, had conducted the frisk of the Defendant, the Court of Criminal Appeals classified the error as inconsequential because the totality of the circumstances established the requisite reasonable suspicion, supported by specific and articulable facts, that a criminal offense was being committed:

> The defendant was in the close vicinity of the motel room given in the dispatch, and he was pointed out to Officer McCurrie by an African-American male at the scene as the armed individual.  Even though it was an anonymous tip which directed the police officers to the area, the detention of the defendant was fully justified by what the officers learned and observed once they arrived at the scene.

Id.

In the application for permission to appeal to this Court, the Defendant asserted that

because Officer Nelson, upon being confronted with the contents of the recorded dispatch at the suppression hearing, recanted his testimony about having information regarding a "robbery in progress" and conceded that the dispatcher made no mention of the physical description, race, and gender of the suspect or suspects, the trial court had no basis to either accredit his testimony or uphold the validity of the frisk. This Court granted the application to consider the propriety of the investigatory stop based upon the content of the anonymous tip and the circumstances observed at the scene.

## Standard of Review

The standard of review applicable to suppression issues is well established. When the trial court makes findings of fact at the conclusion of a suppression hearing, they are binding upon this Court unless the evidence in the record preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.

Id. Our review of a trial court's application of law to the facts is de novo, however, with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

Further, appellate courts, when evaluating the correctness of the ruling by the trial court on a motion to suppress, may consider the entire record, including not only the proof offered at the hearing, but also the evidence adduced at trial. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998); see also State v. Chopin, 372 So. 2d 1222, 1223-24 n.2 (La. 1979); State v. Bruno, 595 A.2d 272, 273 (Vt. 1991); Wayne R. LaFave, Search and Seizure § 11.7(d) (4th ed. 2004) [hereinafter LaFave]. Although the evidence at trial established that Officer McCurrie conducted the frisk of the Defendant rather than Officer Nelson or Officer Short, the pertinent facts are not in dispute. Our review, therefore, is de novo—one of application of the law to the facts.

## Applicable Law

The Fourth Amendment to the United States Constitution and article 1, section 7 of the Tennessee Constitution provide protections against unreasonable searches and seizures. See U.S. Const. amend. IV (stating that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated"); Tenn. Const. art. 1, § 7 (providing "[t]hat the people shall be secure in their

persons, houses, papers and possessions, from unreasonable searches and seizures").[3] "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). These constitutional protections, which apply to all seizures of the person regardless of the length of the detention, are designed to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998) (quoting Camara v. Mun. Court, 387 U.S. 523, 528 (1967)); see also State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007).

Evidence obtained by a warrantless search or seizure "is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). An investigatory stop and frisk is, of course, one of the exceptions to the warrant requirement.[4] Terry v. Ohio, 392 U.S. 1, 27 (1968). When an officer has reasonable suspicion, supported by specific and articulable facts, to believe that a criminal offense has been or is about to be committed, a detention is warranted. Id. at 21; see also Hughes v. State, 588 S.W.2d 296, 305 (Tenn. 1979). Further, once a valid stop is made, a protective frisk is warranted if a police officer has a "reasonable, particularized suspicion that the suspect is armed." State v. Bridges, 963 S.W.2d 487, 493 (Tenn. 1997). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue [an] investigation without fear of violence." Id. (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)). Trial courts must examine the totality of the circumstances when evaluating whether an officer has established the requisite level of suspicion to justify a Terry stop. State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000). These circumstances include: an officer's observations; information from other law enforcement personnel or agencies; information

---

[3] Our state constitution has been interpreted to offer more protection than the corresponding provisions of the Fourth Amendment in some contexts. See, e.g., State v. Jacumin, 778 S.W.2d 430, 436 (Tenn. 1989) (adopting, for purposes of measuring whether probable cause exists for the issuance of a search warrant pursuant to article I, section 7, the standard articulated in Aguilar v. Texas, 378 U.S. 108 (1964) and Spinelli v. United States, 393 U.S. 410 (1969), rather than the standard defined in Illinois v. Gates, 462 U.S. 213 (1983)); State v. Lakin, 588 S.W.2d 544, 549 (Tenn. 1979) (observing that state court decisions defining "curtilage" for purposes of article I, section 7 "may be somewhat more restrictive than those in other states or than federal decisions, [but that there was] no compelling reason . . . for modifying or overruling them").

[4] There are three categories of police intervention with private citizens: (1) a full scale arrest, which requires probable cause; (2) a brief investigatory detention, requiring reasonable suspicion of wrong-doing; and (3) a brief police-citizen encounter, requiring no objective justification. State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000).

from citizens; known patterns of criminal offenders; or deductions based upon experience. State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). When evaluating the reasonableness of the police officer's suspicion, the nature of the crime suspected may be a factor. See State v. Winn, 974 S.W.2d 700, 703 (Tenn. Crim. App. 1998) (observing that "[a] frisk has been upheld as reasonable when the suspected crime might typically involve the use of a weapon . . . or [a] reasonabl[e] infer[ence] that a weapon might be in the possession of the suspect").

Special considerations arise, however, when the State seeks to justify an investigatory stop based upon information provided by an unidentified informant because "'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'" Florida v. J.L., 529 U.S. 266, 270 (2000) (quoting Alabama v. White, 496 U.S. 325, 329 (1990)). As the Supreme Court has stated, the establishment of reasonable suspicion, when based upon an anonymous report,

> is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the totality of the circumstances—the whole picture, that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.

White, 496 U.S. at 330 (internal quotation marks and citations omitted). Under the Tennessee Constitution, "the basis of the informant's knowledge of the conveyed information" and his or her credibility must both be established. State v. Hanning, 296 S.W.3d 44, 49 (Tenn. 2009); see also State v. Day, 263 S.W.3d 891, 903 (Tenn. 2008); State v. Pulley, 863 S.W.2d 29, 31 (Tenn. 1993). In some cases, however, "independent corroboration [by the police] may generally make up any deficiencies . . . ." State v. Coleman, 791 S.W.2d 504, 507 (Tenn. Crim. App. 1989); see also State v. Wilhoit, 962 S.W.2d 482, 487 (Tenn. Crim. App. 1997).

**Analysis**
**A. Seizure**

The Defendant asserts that he was seized when one of the police officers drew his weapon at the motel. He argues that because the officers did not have the requisite level of information to warrant a detention at that time, the trial court should have granted the motion to suppress the revolver as evidence. He contends that "there is nothing inherently criminal about being an armed party unless the armed party does not have a permit," and that "[t]here is . . . nothing in the record to suggest the existence of a situation involving either an active or preparatory offense involving the use of a weapon."

A seizure takes place "'when an officer, by means of physical force or show of authority, has in some way restrained the liberty of [the] citizen.'" State v. Williams, 185 S.W.3d 311, 316 (Tenn. 2006) (quoting Terry, 392 U.S. at 19 n.16). If "a reasonable person would have believed that he was not free to leave" or to otherwise terminate the encounter in view of the surrounding circumstances, a seizure has occurred. United States v. Mendenhall, 446 U.S. 544, 554 (1980) (plurality opinion); see also I.N.S. v. Delgado, 466 U.S. 210, 215 (1984) (adopting the plurality view expressed in Mendenhall); State v. Daniel, 12 S.W.3d 420, 425 (Tenn. 2000). In Daniel, this Court set out factors to be used in the determination of whether a seizure has taken place: (1) the time, place, and purpose of the encounter; (2) the words used by the officer; (3) the officer's tone of voice and general demeanor; (4) the officer's statements to others who were present during the encounter; (5) the threatening presence of several officers; (6) the display of a weapon by an officer; and (7) the physical touching of the person. 12 S.W.3d at 425-26; see also Michigan v. Chesternut, 486 U.S. 567, 575 (1988); Mendenhall, 446 U.S. at 554; LaFave § 5.1(a). This Court described the test as "'necessarily imprecise because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation,'" Daniel, 12 S.W.3d at 426 (quoting Chesternut, 486 U.S. at 573), and further observed that the display of a weapon by the police "convey[s] a message that compliance . . . is required." Id. Moreover, in Williams, this Court held that "a show of authority [by the police]—the activation of the blue emergency lights—from which a reasonable person would not have felt free to leave" qualifies as a seizure. 185 S.W.3d at 317. "[T]he litmus test is the objective belief of a reasonable person in the position of the defendant, not that of the officer." Id. at 318.

In this instance, several officers in a variety of police vehicles converged upon the Baxter Motel in response to a complaint of an "armed party." At least one officer drew his service weapon, pointing it in the direction of the Defendant and two other individuals on the second floor balcony. When Yarbrough, a guest at the motel, was frisked by Officer Short, a bystander suggested to Officer McCurrie that the Defendant had a gun.[5] In our view, the time of the encounter; the show of force by the officers present; the drawing of a weapon; and the pat-down of Yarbrough at the scene are all factors establishing that a reasonable person in the position of the Defendant had reason to believe he had been seized by the police prior to being frisked by Officer McCurrie. At the latest, the seizure occurred at the time of the frisk. In either event, our conclusions regarding the admission of the revolver as evidence would be the same.

---

[5] We address infra the State's argument that the bystander, who pointed out the Defendant to Officer McCurrie at the scene, established an independent source of reasonable suspicion upon which to justify the seizure and frisk.

## B. Reasonable Suspicion

Because there was a seizure, the question becomes whether the anonymous tip, either standing alone or as corroborated by other circumstances, provided the officers with the reasonable suspicion required to justify the seizure of the Defendant and the subsequent frisk for weapons. The State first contends that the high crime area, the early morning hour, and the interest of the public in preventing illegal activity established a satisfactory basis for the police to make an investigatory stop and frisk at the time of their arrival. In the alternative, the State argues that if the seizure took place at the time of the frisk, the bystander who reported that the Defendant had the gun provided sufficient corroboration. As its final argument, the State asserts that if there was no reasonable basis for the detention either upon the arrival of the police or after the report by the bystander, Officer McCurrie's detection of the smell of alcohol and the Defendant's slurred speech justified the frisk.

J.L. is the United States Supreme Court's most recent decision considering the propriety of an investigatory stop involving an anonymous tip. In that case, an unidentified caller reported to the police that a young black male wearing a plaid shirt was in possession of a gun at a particular bus stop. 529 U.S. at 268. Officers arrived about six minutes after being dispatched. Id. When officers investigated, they saw no illegal conduct but did observe that one of three men at the bus stop, J.L., was wearing a plaid shirt. Id. An officer frisked J.L. and found a gun in his pocket. Id. In a unanimous opinion,[6] the Court first addressed the characteristics of anonymous tips:

> Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity. As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.

Id. at 270 (citations and internal quotation marks omitted). After concluding that the call concerning J.L., a juvenile, "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility," id. at 271, the Court held

---

[6] Justice Kennedy, who wrote a separate concurrence, in which Chief Justice Rehnquist joined, pointed out that, in future cases, "a tip might be anonymous in some sense yet have certain other features, either supporting reliability or narrowing the likely class of informants, so that the tip does provide the lawful basis for some police action." Id. at 275 (Kennedy, J., concurring). He "join[ed the Court's] opinion in all respects," however, and agreed that the anonymous telephone tip at issue "did not justify the arresting officer's immediate stop and frisk of [the defendant]." Id. at 274-75.

-9-

that, even though the officers actually found a weapon, this did not provide justification for the frisk:

> The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant].

Id. (emphasis added). The Supreme Court rejected the argument that the accuracy of the description of J.L.'s shirt was corroborative, observing that reasonable suspicion "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." Id. at 272 (emphasis added).

Second, the Court declined to adopt a "firearm exception" to the Terry standard, an argument advanced by the prosecution, which would have justified a stop and frisk based on "a tip alleging an illegal gun . . . even if the accusation would fail standard pre-search reliability testing." Id. (emphasis added). The Court held that "[s]uch an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun." Id.

Finally, the Court clarified its ruling as follows:

> [T]he requirement that an anonymous tip bear standard indicia of reliability in order to justify a stop in no way diminishes a police officer's prerogative, in accord with Terry, to conduct a protective search of a person who has already been legitimately stopped. We speak in today's decision only of cases in which the officer's authority to make the initial stop is at issue. In that context, we hold that an anonymous tip lacking indicia of reliability of the kind contemplated in Adams[ v. Williams, 407 U.S. 143 (1972)] and [Alabama v.] White[, 496 U.S. 325 (1990)] does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm.

Id. at 274 (emphasis added).[7]

---

[7] In Hanning, 296 S.W.3d at 50-51, this Court distinguished J.L. Hanning is different, however, than the case before us. In Hanning, there was an anonymous tip alleging the crime of reckless driving on the interstate in which the caller provided a description of the vehicle involved. Id. at 46. The tip did not involve

(continued...)

-10-

Since the Court's decision in J.L., its principles have been applied in a variety of cases on both the federal and state levels.[8] Recently, the Court of Appeals for the Fourth Circuit addressed the denial of a motion to suppress under facts similar to those before this Court today. In United States v. Massenburg, 654 F.3d 480 (4th Cir. 2011), police received an anonymous phone call alleging that eight shots had been fired in "a high-crime area." Id. at 482-83. As in this case, there was no description of the suspect. Id. at 483. One of the officers who responded to the call saw four young black men walking a few blocks from where the shots were allegedly fired. Id. At the officer's request, the men stopped "to talk," and one of the individuals claimed to have heard shots fired from a vehicle a short distance away. Id. When a second officer arrived at the scene, the men gave their names and were asked to consent to a pat down. Id. While two of the men consented, the defendant, according to one of the officers, "was kind of hesitant and stand-offish, . . . reluctant to give consent to a pat down." Id. The officer, however, persisted and felt the handle of a gun in

---

[7](...continued)
any allegations about a weapon. The investigating officer found corroborating circumstances at the scene. Id. at 50. This Court did not adopt a "firearms exception."

Other courts have similarly distinguished J.L., holding that an anonymous tip alleging reckless driving may justify a stop. See, e.g., United States v. Wheat, 278 F.3d 722, 729 (8th Cir. 2001); People v. Wells, 136 P.3d 810, 815-16 (Cal. 2006); State v. Prendergast, 83 P.3d 714, 723-24 (Haw. 2004). But see Harris v. Commonwealth, 668 S.E.2d 141, 146 (Va. 2008) (holding that an anonymous tip alleging that a person was driving while intoxicated, by itself, was insufficient to "establish the requisite quantum of suspicion for an investigative stop"). One commentator, while expressing concerns about the reliability of an anonymous tip absent adequate corroboration, argues that a report of dangerous or unlawful driving presents an emergency which would merit a Terry stop. Jason Kyle Bryk, Anonymous Tips to Law Enforcement and the Fourth Amendment: Arguments for Adopting an Imminent Danger Exception and Retaining the Totality of the Circumstances Test, 13 Geo. Mason U. Civ. Rts. L.J. 277, 303 (2003); see also Chris La Tronica, Could You? Should You? Florida v. J.L.: Danger Dicta, Drunken Bombs, and the Universe of Anonymity, 85 Tul. L. Rev. 831, 844-57 (2011) (discussing various cases in which courts have applied a so-called "drunk-driving" exception and those in which courts have required indicia of reliability as to the tip or independent corroboration). But see Melanie D. Wilson, Since When Is Dicta Enough to Trump Fourth Amendment Rights? The Aftermath of Florida v. J.L., 31 Ohio N.U. L. Rev. 211, 229 (2005) (arguing that "[t]o rule that an anonymous, but urgent, 911 call without any other indicia of believability or reliability removes the Fourth Amendment reasonable suspicion requirement would be to abolish the protections of the Fourth Amendment altogether").

[8] See, e.g., United States v. Copening, 506 F.3d 1241, 1247-48 (10th Cir. 2007) (holding that anonymous calls provided authorities with sufficient indicia of reliability to justify the stop of the car in which the defendant was a passenger); Joseph v. United States, 926 A.2d 1156, 1165-66 (D.C. 2007) (holding that the reliability of the informant's tip and the informant's demonstrated basis of knowledge established the requisite reasonable suspicion to justify the stop); cf. Abdul-Jalil v. Commonwealth, 324 S.W.3d 433, 436-37 (Ky. Ct. App. 2010) (holding that anonymous tip alleging that suspect had possession of a handgun used in a recent homicide did not provide probable cause to seize and search the suspect's car).

the defendant's waistband. The defendant was subsequently charged with both gun and drug-related offenses. Id. The district court upheld the propriety of the stop and frisk based upon the following factors: (1) "a vague report" of gunshots; (2) the close proximity of Massenburg to the area of the alleged gunfire; (3) the fact that it was a "high-drug, high-crime area"; (4) Massenburg's nervousness when asked if he would consent to a pat-down; and (5) the officer's experience. Id. at 484-85. The Fourth Circuit reversed, first emphasizing that in order to justify a frisk, "the Constitution requires 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Id. at 486 (quoting United States v. Griffin, 589 F.3d 148, 152 (4th Cir. 2009)). The court found "precious little" to demonstrate that the officer "had reasonable, particularized suspicion . . . such that a non[-]consensual frisk was lawful under the Fourth Amendment," holding that the anonymous tip neither provided any predictive information about the suspect nor tested the knowledge or credibility of the informant. Massenburg, 654 F.3d at 486-87. In addition, the court found that the tip's reliability was undermined because it did not include a "physical description of the perpetrators or any other outward identifying features," meaning that "the only link between the tip and Massenburg's group was [their] rough proximity to the alleged site of the gunfire." Id. at 487. Finally, the court observed that the location of the incident in a high-crime area failed to bolster the credibility or reliability of the anonymous tip. Id. at 488. "To hold otherwise," the court ruled,

> would be to authorize general searches of persons on the street not unlike those conducted of old by the crown against the colonists. Allowing officers to stop and frisk any individuals in the neighborhood after even the most generic of anonymous tips would be tantamount to permitting a regime of general searches of virtually any individual residing in or found in high-crime neighborhoods, where complaints of random gunfire in the night are all too usual[].

Id. (alteration in original) (internal quotation marks omitted).

The Supreme Judicial Court of Massachusetts has come to a similar conclusion under facts comparable to those before us today. In Commonwealth v. Gomes, 937 N.E.2d 13 (Mass. 2010), an anonymous 911 caller complained to police that a man in an area known for gang activity was "holding a gun in the air." Id. at 14. The suspect was described as a black male standing outside a green Honda and dressed in a gray shirt and yellow pants. Id. The first officer to respond to the scene found a Honda and asked Gomes to step outside of the vehicle. Id. Gomes was frisked and was asked if he had any weapons. He answered that there was a gun in his automobile. Id. Although the trial court denied a motion to suppress, the Massachusetts high court, relying largely on the decision in J.L., held that the anonymous tip did not justify the stop and frisk for the following reasons: (1) there was nothing to

establish "the 911 caller's identity," his or her "basis of knowledge or veracity," or independent corroboration by the police "of more than innocent details"; (2) the threat of danger under the circumstances was not so great that it overcame the lack of demonstrated reliability of the anonymous tip; and (3) Gomes had "made no furtive, evasive, or otherwise suspicious movements, nor did he make any statements to arouse suspicion." Id. at 15-16. The court declined to place any significance on the claim that "the area was known for 'gang activity.'" Id. at 16.

A number of other courts, addressing similar factual circumstances, have also suppressed evidence based upon the holding in J.L. See, e.g., United States v. Colon, 250 F.3d 130, 138 (2d Cir. 2001) (holding that "an anonymous tip containing descriptive but no predictive detail, [was an] insufficient . . . basis . . . to support the stop and frisk"); Berry v. State, 766 N.E.2d 805, 806, 808-10 (Ind. Ct. App. 2002) (holding that an anonymous tip, which described the suspect's appearance and his vehicle, and indicated that the suspect made threats as he waved a firearm in a restaurant parking lot, did not provide sufficient predictive information, nor did the officer independently observe behavior justifying a stop); People v. Ballard, 719 N.Y.S.2d 267, 267-68 (N.Y. App. Div. 2001) (holding that an anonymous 911 call describing a black male and his clothing and claiming that he had "a black plastic bag containing a gun" was "without more . . . not a sufficient basis upon which to stop and frisk a suspect" who matched the description).

Based upon our review of J.L., and the numerous cases with comparable facts, we conclude that the anonymous tip to the Covington police was insufficient to support the stop and frisk of the Defendant. The unidentified 911 caller, whose complaint was relayed to the various officers by dispatch, contained only an allegation that an armed individual was outside a particular room at the Baxter Motel. The content of the tip provided even less support for a stop and frisk than that in J.L., as there was no description of the suspect, much less "predictive information," which would allow police "to test the informant's knowledge or credibility." 529 U.S. at 271; cf. United States v. Jones, 242 F.3d 215, 218 (4th Cir. 2001) (concluding that the anonymous tip at issue, which alleged that several black males were "causing a disturbance" and consuming alcohol, "was so barren of detail about the alleged culprits' physical descriptions that it was even less reliable than the deficient tip in J.L."). Because of the lack of descriptive information, as in Massenburg, "the only link between the tip" and the Defendant was his proximity to Room 21. 654 F.3d at 486-87.[9] In Gomes, the tip at issue was substantially more detailed than the one before this Court, including a description of the suspect's appearance, the make and color of his car, in addition to the

---

[9] Although the Defendant here was closer to the location identified by the anonymous tipster than the defendant in Massenburg, we do not find this fact to be persuasively probative based upon the other factors discussed in this opinion.

-13-

allegation that he was "holding a gun in the air" in a high-crime area, 937 N.E.2d at 14, yet the court determined that it was insufficient. In comparison, the tip in this case falls far short of providing sufficiently probative information.

In addition, one's status as an "armed party" is not per se illegal. See generally Tenn. Code Ann. § 39-17-1351(b) (2006) (providing that "any resident of Tennessee who is a United States citizen or permanent lawful resident . . . who has reached twenty-one (21) years of age, may apply to the department of safety for a handgun carry permit," and that "[i]f the applicant is not prohibited from purchasing or possessing a firearm in this state pursuant to" a provision of state or federal law and "otherwise meets all of the requirements of this section, the department shall issue a permit to the applicant"). While the carrying of a firearm under certain circumstances may constitute a crime,[10] the caller did not offer any articulable facts indicating that the Defendant unlawfully possessed a gun, and the information at the scene did not demonstrate the unlawfulness of its possession until after the frisk. See United States v. Ubiles, 224 F.3d 213, 218 (3d Cir. 2000) (holding that an anonymous tip alleging that the defendant was in possession of a firearm did not give the authorities evidence "suggesting that the gun [the defendant] possessed was defaced or unlicensed," or such other circumstances which would have rendered his carrying of a weapon a crime). Because there was no "assertion of illegality" in the tip, J.L., 529 U.S. at 272, the officers lacked the requisite level of suspicion to first detain and then frisk the Defendant for weapons.

While the Baxter Motel's location in a high-crime area and the time of the complaint to the police may be relevant factors in the consideration of the propriety of a stop and frisk,[11] those cases in which the Supreme Court upheld stops and frisks occurring in high-crime areas have included significant other factors, such as the reliability of the informant or the police officer's own observations.[12] To accept the State's argument that the location of this

---

[10] See generally Tenn. Code Ann. § 39-17-1307 (2006) (prohibiting a person from "carr[ying a firearm] with the intent to go armed" and prohibiting persons convicted of certain offenses from possessing firearms).

[11] See State v. Nicholson, 188 S.W.3d 649, 661 (Tenn. 2006) (agreeing that "a location's characteristics may be relevant to amassing reasonable suspicion").

[12] For instance, in Adams, the Court held the frisk of the defendant to be supported by reasonable suspicion because the informant approached the officer face-to-face in order to inform him that the defendant had narcotics and a gun on his person; the officer knew the informant personally and had received accurate tips from him in the past; and the tip was "immediately verifiable." 407 U.S. at 146-47. Furthermore, because the defendant, rather than complying with the officer's request to step out of the car, merely rolled down the window, the Court determined that the officer was justified in frisking the defendant for his own

(continued...)

encounter, the time at which it occurred, and the generalized "public[] interest in abating criminal activity" somehow tipped the scales in favor of reasonable suspicion would, in effect, establish an exception for those persons in "high-crime" areas at certain hours of the day or night. Such generalized authority to conduct random searches is precisely the type of evil against which the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution were meant to protect. Cf. Thomas Y. Davies, Recovering the Original Fourth Amendment, 98 Mich. L. Rev. 547, 724 (1999) ("The Framers aimed the Fourth Amendment precisely at banning Congress from authorizing use of general warrants."). Because the anonymous tip failed to provide the responding officers with the requisite reasonable suspicion to seize and subsequently frisk the Defendant, the revolver should have been suppressed as evidence.

The State further contends, however, that even if the initial seizure was illegal, the unidentified bystander at the motel who informed Officer McCurrie that the Defendant was carrying a gun supplied sufficient corroboration to warrant the stop and frisk. Indeed, a face-to-face encounter with an informant generally lends more credibility to the tip, and, in consequence, may often serve to increase its reliability. See United States v. Valentine, 232 F.3d 350, 354 (3d Cir. 2000) (noting that "a tip given face to face is more reliable than an anonymous telephone call"); cf. J.L., 529 U.S. at 275 (Kennedy, J., concurring) (observing that "[i]f an informant places his anonymity at risk, a court can consider this factor in weighing the reliability of the tip"). If, however, the tip fails to provide an officer with any probative or predictive information regarding potential illegal activity, the increased level of reliability is simply not enough. For example, in Ubiles, 224 F.3d at 215, an anonymous informant approached several police officers at a crowded celebration[13] asserting that there was a man nearby who had a gun in his possession.[14] The informant pointed at Ubiles and described his appearance. Id. at 215. "The informant did not explain how he knew that the man had a gun" and "also did not describe, at the time, anything suspect about the gun or anything unusual or suspicious about the man or his behavior." Id. The officers approached

---

[12](...continued)
safety, namely because the encounter occurred early in the morning in a high-crime area. Id. at 147-48. Similarly, in Illinois v. Wardlow, 528 U.S. 119, 124 (2000), the Court held that a suspect's unprovoked flight, coupled with the fact that it occurred in a neighborhood known for heavy narcotics trafficking, established the reasonable suspicion necessary to justify the frisk of the suspect. None of these additional factors were present in the case before us.

[13] The St. Thomas celebration, known as the "J'ouvert Carnival," "celebrates the sunrise, and . . . [is] typically crowded and boisterous," with "[h]undreds if not thousands of revelers . . . [who] often consume a great deal of alcohol." Id. at 214-15.

[14] Although, at trial, the informant testified that he observed "something that looked like a gun pass from another man to [the defendant]," he did not relate this information to the officers. Id. at 216.

Ubiles and, even though he "exhibited no unusual or suspicious behavior," discovered a machete and a loaded gun in a pat-down search. Id. After his conviction, the Third Circuit reversed, finding that the officers "had no reason to believe that Ubiles was 'involved in criminal activity . . . .'" Id. at 217 (quoting Wardlow, 528 U.S. at 120). Importantly, the court first ruled that under the applicable law of the Virgin Islands, it was "not necessarily a crime to possess a firearm," and that "a mere allegation that a suspect possesses a firearm, as dangerous as firearms may be, [does not] justify an officer in stopping a suspect absent the reasonable suspicion required by Terry." Id. at 217-18 (citing J.L., 529 U.S. at 272). Second, the court held that while there were ways in which possession of a gun would be a crime, such as possessing a gun with an altered serial number or a gun that was unlicensed, no evidence had been presented during the suppression hearing "suggesting that [the officers] w[ere] aware of any articulable facts" indicative of any illegality. Id. at 218. Third, even assuming that the informant was reliable, the court observed that the information imparted to the officers merely demonstrated that Ubiles "was another celebrant lawfully exercising his right under Virgin Islands law to possess a gun in public." Id.

The holding in Ubiles is instructive.[15] As in that jurisdiction, possession of a firearm in this state is not necessarily a crime. Furthermore, while there might be some instances in which carrying a gun would be unlawful, the bystander at the scene did not provide Officer McCurrie with any such information. Even though a face-to-face encounter with an informant is generally more reliable than an anonymous phone call, and could, in some instances, corroborate a previously-received tip, the information provided by the bystander at the Baxter Motel did not indicate that the Defendant's possession of the handgun was unlawful. See id.

The State's final contention is that even if none of the officers had reasonable suspicion either at the outset of their encounter with the Defendant or after the comment by the bystander at the scene, the fact that Officer McCurrie detected signs of intoxication served to establish the requisite reasonable suspicion necessary for the frisk, meaning that the revolver "would have inevitably [been] discovered." The State seeks to rely on the "inevitable discovery" doctrine or exception, which "rests upon the principle that the remedial purposes of the exclusionary rule are not served by suppressing evidence discovered through a later, lawful seizure that is genuinely independent of an earlier, tainted one." Hudson v. Michigan, 547 U.S. 586, 616 (2006) (internal quotation marks omitted). The sequence of events as related by Officer McCurrie, however, does not support the State's

---

[15] Although Ubiles is factually distinguishable, in that there was only one informant, whereas here, there were two—the anonymous phone call and the bystander at the Baxter Motel—we nonetheless find the opinion's rationale persuasive because the two tips at issue did not serve to increase the officer's information regarding potentially illegal activity.

reliance upon this exception. His testimony clearly establishes that he had conducted the pat-down of the Defendant before he noticed any signs of intoxication. Because we have determined that Officer McCurrie had no reason to frisk the Defendant initially, the only way he discovered that the Defendant was allegedly intoxicated was as a result of the illegal seizure and frisk. This did not constitute a lawful seizure that was "genuinely independent" from the earlier ones. An observation occurring after a frisk "cannot retroactively make th[e officer's] actions objectively reasonable." Colon, 250 F.3d at 138. A ruling upholding the propriety of a "stop based on the fruits obtained as a result of the subsequent search" would eviscerate the protections afforded by our state and federal constitutions. Ubiles, 224 F.3d at 218. "The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." J.L., 529 U.S. at 271 (emphasis added). In this instance, the officer simply did not possess the level of information necessary to seize and frisk the Defendant under any of the theories advanced by the State.

## Conclusion

Because the anonymous report of an armed party, absent corroboration and other indicia of reliability as to criminal activity, did not establish reasonable suspicion based upon specific, articuable facts, there was an insufficient basis for the investigatory stop and frisk of the Defendant. The evidence seized, therefore, should be suppressed. The convictions are reversed and the cause dismissed. Costs are adjudged against the State.


_____
GARY R. WADE, JUSTICE