# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 11, 2015 Session

## STATE OF TENNESSEE v. JACOB DALE GORMSEN

### Appeal from the Circuit Court for Williamson County
### No. IICR027808     Timothy L. Easter, Judge

_____

### No. M2014-01731-CCA-R3-CD – Filed October 6, 2015

_____

The defendant, Jacob Dale Gormsen, pled guilty to one count of driving under the influence, a Class A misdemeanor, in violation of Tennessee Code Annotated section 55-10-401 (2010). He reserved a certified question challenging the trial court's denial of his motion to suppress. The defendant asserts that his encounter with law enforcement was not consensual and that law enforcement had no probable cause or reasonable suspicion to initiate an investigatory stop after discovering him unconscious in a running vehicle on the road. We conclude that the interaction between the defendant and the officer began as a consensual police-citizen encounter and that the officer possessed reasonable suspicion at the point that the interaction became an investigatory stop. Accordingly, we affirm the denial of the motion to suppress.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Vanessa Pettigrew Bryan, District Public Defender; and J. Gregory Burlison, Assistant District Public Defender, for the Appellant, Jacob Dale Gormsen.

Herbert H. Slatery III, Attorney General and Reporter; Andrew Coulam, Assistant Attorney General; Kim R. Helper, District Attorney General; and Carlin Hess, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

At 3:51 a.m. on August 20, 2013, Officer Stan Boyd of the Brentwood Police Department responded to a citizen request for an investigation of two teenagers hiding behind a car. At the suppression hearing, Officer Boyd testified that he proceeded to Wikle Road West, a dead-end street in a completely residential area. He did not observe any teenagers, but he saw a vehicle which appeared to have simply stopped in the roadway. All four tires were in the road, and Officer Boyd could see that the brake lights were illuminated but the vehicle was not moving. Officer Boyd stopped his patrol car approximately fifteen to twenty feet behind the vehicle. He did not turn on his emergency lights, and he did not block the vehicle from pulling away.

When Officer Boyd exited the patrol car, he was able to determine that the defendant's vehicle was running and that the window was down. Officer Boyd testified that he observed two occupants, both "slouched over" and apparently unconscious or asleep. Officer Boyd testified he said, "[H]ey, what are you guys doing[?]" The occupants did not respond, so Officer Boyd continued trying to get their attention verbally, and he shined his flashlight, using the strobe function, into the eyes of the driver. The defendant still did not respond. Officer Boyd yelled, "Hey!" loudly at the defendant and shook him, and the defendant opened his eyes, gave Officer Boyd a blank look, and closed his eyes again. The defendant's eyes were bloodshot. When Officer Boyd shook the defendant to waken him, the defendant "started mumbling." Officer Boyd described the defendant's speech as "slurred."

As the defendant began to awaken, Officer Boyd ordered him multiple times to turn off the car. Officer Boyd testified that the defendant "was just looking straight ahead at times," appeared confused, and was not responding to Officer Boyd. Officer Boyd decided to open the car door because he was concerned the defendant might "drive off and crash." Officer Boyd believed that the defendant was either experiencing a medical emergency or was impaired.

Officer Boyd reached inside, turned off the vehicle, and put the keys on top of the car. He asked if there was something wrong with the car. The defendant then attempted to close the car door on top of Officer Boyd. Officer Boyd asked for the defendant's driver's license, and the defendant gave Officer Boyd a credit card and his license.

2

Officer Boyd testified that he smelled alcohol coming from the vehicle at some point while he made contact with the defendant but could not recall exactly when he first became aware of the odor of alcohol.

The defendant told Officer Boyd that he had been in downtown Nashville and was taking his brother home. The defendant said he had been pulled over by an officer and acknowledged drinking four drinks. Officer Boyd administered field sobriety tests, and he placed the defendant under arrest.

Officer Boyd agreed that the original report of teenagers hiding behind a car did not appear to be connected with the defendant. He stated that the defendant's car was not blocking the road, and he agreed that the video showed another vehicle maneuvering around the stopped vehicle. Officer Boyd testified that other police cars arrived within a few minutes and that he did not recall if their emergency lights were activated. Officer Boyd testified that he could not remember if he smelled alcohol prior to telling the defendant to turn off the car. He agreed that it was possible that someone just waking up could be confused. He testified that when he turned the car off, he was concerned about the defendant's welfare.

The video of the traffic stop, which was introduced into evidence, was generally consistent with Officer Boyd's testimony. The video shows that Officer Boyd spent approximately one minute at the window attempting to wake the defendant prior to ordering him to turn off the car. The video also reveals that Officer Boyd's exact words to the occupants of the vehicle were, "What's up, guys?" In the video, the defendant told Officer Boyd that he had had five drinks and that his brother had had four. Although Officer Boyd did not directly testify that the defendant was the driver of the vehicle, his testimony, combined with the video of the traffic stop, is not subject to any other interpretation.

The trial court denied the motion to suppress. In denying the motion, the trial court found that the defendant's vehicle was blocking the right lane of traffic on a dead-end street, that the brake lights were on, and that the vehicle was running. The trial court found that Officer Boyd did not activate his lights or obstruct the vehicle's passage and that the vehicle's occupants were unresponsive. The trial court concluded that Officer Boyd was exercising his community caretaking function in attempting to rouse the defendant, who was slumped over, unresponsive to a strobe light, mumbling, and confused. The trial court found that the odor of alcohol then gave the officer reasonable suspicion to initiate an investigatory stop but did not make a finding regarding when Officer Boyd detected the odor of alcohol.

The defendant pled guilty and reserved the following certified question under Tennessee Rule of Criminal Procedure 37(b)(2)(A):

> Whether the trial court erred in denying the appellant's motion to suppress in ruling that Officer Stanley Boyd's actions and statements prior to obtaining reasonable suspicion of criminal activity did not amount to an illegal seizure of the appellant and were a proper exercise of the community caretaking function of law enforcement.

## ANALYSIS

### I. Certified Question

The defendant presents a certified question appealing the denial of his motion to suppress. Under Tennessee Rule of Criminal Procedure 37(b)(2)(A), a defendant may plead guilty but explicitly reserve the right to appeal a certified question that is dispositive of the case when certain conditions have been met. A question is dispositive when the appellate court is faced with the choice of affirming the judgment of conviction or reversing the conviction and dismissing the charges. *State v. Dailey*, 235 S.W.3d 131, 134 (Tenn. 2007). Because the sole evidence regarding the defendant's intoxication came from the investigatory stop, we agree with the trial court and the parties that the trial court's ruling on the motion to suppress was dispositive and conclude that the defendant has properly preserved a certified question of law.

### II. Motion to Suppress

A trial court's factual determinations in a suppression hearing will be upheld on appeal unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions regarding the credibility of witnesses, the weight or value of the evidence, and determinations regarding conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010). "The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012) (quoting *Odom*, 928 S.W.2d at 23). The trial court's application of the law to the facts is reviewed de novo. *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000).

The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Article I, section 7 of the Tennessee Constitution also guarantees the right of the people to "be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures." Article I, section 7 has traditionally been interpreted as imposing stronger protections than those of the federal constitution. *State v. Moats*, 403 S.W.3d 170, 182 (Tenn. 2013). The prohibition against unreasonable seizures applies even to those seizures of brief duration or limited scope. *State v. Day*, 263 S.W.3d 891, 901 (Tenn. 2008). However, the prohibition on unreasonable searches and seizures does not limit all contact between police and citizens; "[i]nstead these constitutional provisions are designed 'to prevent arbitrary and oppressive interference [by enforcement officials] with the privacy and personal security of individuals.'" *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000) (quoting *INS v. Delgado*, 466 U.S. 210, 216 (1984)). A warrantless search or seizure is presumed unreasonable, and any evidence seized in violation of the Constitution is subject to suppression. *State v. Cox,* 171 S.W.3d 174, 179 (Tenn. 2005).

The Tennessee Supreme Court has recognized three tiers of police-citizen interactions: (1) a full-scale arrest requiring probable cause, (2) a brief investigatory stop, requiring reasonable suspicion of criminal activity, and (3) a brief consensual police-citizen encounter requiring no objective justification. *State v. Williams*, 185 S.W.3d 311, 315 (Tenn. 2006). The first two categories rise to the level of a seizure. *Day*, 263 S.W.3d at 901. On the other hand, "[w]hile arrests and investigatory stops are seizures implicating constitutional protections, consensual encounters are not." *State v. Nicholson,* 188 S.W.3d 649, 656 (Tenn. 2006). Consensual encounters include the community caretaking or public safety functions of law enforcement. *Williams*, 185 S.W.3d at 315. A seizure occurs when, in view of all the circumstances surrounding the incident, a reasonable person would not feel free to terminate the interaction and leave. *Day*, 263 S.W.3d at 902.

A law enforcement officer who approaches an individual in a public place to ask questions does not implicate the constitutional safeguards on searches and seizures, as long as a reasonable person would feel free to disregard the officer. *Williams*, 185 S.W.3d at 315.

> Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at

5

all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds.

*Daniel*, 12 S.W.3d at 425 (quoting *Florida v. Royer*, 460 U.S. 491, 497-98 (1983)). For instance, an officer may approach a car parked in a public place and ask for driver identification and proof of registration without any supporting probable cause or reasonable suspicion of wrongdoing. *State v. Pulley*, 863 S.W.2d 29, 30 (Tenn. 1993). "[T]he police may engage a citizen and ask questions as long as the citizen is willing to carry on the conversation." *State v. Hawkins*, 969 S.W.2d 936, 939 (Tenn. Crim. App. 1997).

The propriety of the conduct of law enforcement depends on the totality of circumstances, including "the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen." *Daniel*, 12 S.W.3d at 426. As long as a reasonable person would have believed that he or she was free to leave, the interaction does not rise to the level of a seizure. *Id.* at 425. The fact that a citizen may feel "an inherent social pressure to cooperate with police," does not eliminate the consensual nature of the encounter. *Id.* This objective determination regarding whether an interaction is consensual is "'necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation.'" *Id.* at 426 (quoting *Michigan v. Chesternut,* 486 U.S. 567,573 (1988)). Circumstances under which a reasonable person would not feel free to leave "will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Id.* As long as police do not convey a message that compliance is required, they may approach an individual in a public place to ask questions or permission to perform a search. *Daniel*, 12 S.W.3d at 426. On the other hand, a seizure occurs if an officer:

(1) pursues an individual who has attempted to terminate the contact by departing; (2) continues to interrogate a person who has clearly expressed a desire not to cooperate; (3) renews interrogation of a person who has earlier responded fully to police inquiries; (4) verbally orders a citizen to stop and answer questions; (5) retains a citizen's identification or

6

other property; (6) physically restrains a citizen or blocks the citizen's path; (7) displays a weapon during the encounter.

*State v. Randolph*, 74 S.W.3d 330, 337 (Tenn. 2002) (quoting *Daniel*, 12 S.W.3d at 426).

In *State v. Moats*, the Tennessee Supreme Court noted that consensual encounters such as those that take place under law enforcement's community caretaking function "involve *no coercion or detention*." *Moats*, 403 S.W.3d at 181 (quoting *v. Hawkins,* 969 S.W.2d at 939) (emphasis in *Moats*). The *Moats* court noted that the activation of emergency lights does not negate the community caretaking function or constitute a seizure when the activation of the lights is not related to the investigation or detection of criminal activity and not used as a show of authority directed at a particular person. *State v. Moats*, 403 S.W.3d at 185, 186 n.7. The court in *Moats* determined that law enforcement had seized the defendant when an officer pulled in behind him in an empty parking lot and activated her lights, because the activation of the lights could not have been directed at anyone but the defendant and a reasonable person in the defendant's situation would not have felt free to leave. *Id.* at 186.

This case obviously differs from *Moats* in that Officer Boyd's emergency equipment was never activated. Officer Boyd noticed a car sitting in the middle of one lane of a residential, dead-end street with the vehicle's brake lights on at around 3:51 a.m. He pulled in behind the vehicle, in no way obstructing its path. He did not activate his emergency equipment. Instead, Officer Boyd walked up to the open window of a vehicle on the public roadway, just as any citizen might. The fact that Officer Boyd approached the defendant and addressed him while the defendant was parked on the public street does not implicate any Fourth Amendment concerns. *Williams*, 185 S.W.3d at 315.

On noticing that the car was running and that two people appeared to be unconscious and slumped over in the car, Officer Boyd began to attempt to rouse the defendant. When the defendant did not respond, Officer Boyd also shined a strobe light in the defendant's eyes. His efforts at rousing the defendant by speaking, shining the light, and raising his voice were unsuccessful, so Officer Boyd also reached in the open window to shake the defendant in order to wake him. Officer Boyd did not at this point detain the defendant, pursue him, order him to stop, block his path, or display a weapon. Neither did the defendant, who was apparently in a stupor, at any point attempt to terminate his contact with law enforcement.

Evaluating the factors listed in *Daniel* to determine the coercive effect of Officer Boyd's conduct, we note that the encounter occurred late at night on a residential street and that the trial court found that Officer Boyd's "humanitarian" purpose was to check on

the welfare of the car's occupants. His words, tone, and demeanor were not coercive. Officer Boyd was initially the only officer present, although he was shortly joined by several other officers. Although Officer Boyd made physical contact with the defendant when he briefly shook him, the trial court found that the defendant was possibly in need of medical attention and that Officer Boyd was attempting to rouse him. We conclude that the interaction was a third-tier, consensual police-citizen encounter. The totality of the circumstances indicates that a reasonable person in the defendant's position, after waking, would have felt free to terminate contact and leave during this initial interaction with Officer Boyd. Accordingly, Officer Boyd was engaged in community caretaking and his conduct was justifiable as a consensual police-citizen encounter.

The defendant relies heavily on this court's opinion in *State v. Jerry R. Shouse* for the proposition that the encounter between the defendant and law enforcement was not consensual. *See State v. Jerry R. Shouse*, M2013-00863-CCA-R3CD, 2014 WL 1572451, at *7 (Tenn. Crim. App. Apr. 21, 2014) *no perm. app. filed*. In *Shouse*, the defendant was parked in an empty parking lot at 11:00 p.m. *Id.* at *1. An officer approached the vehicle without activating his emergency lights, and he knocked on the window. *Id.* The defendant appeared unconscious and was unresponsive to the knocking. *Id.* The officer opened the door of the vehicle and detected the odor of alcohol. *Id.* This court concluded that the officer's action in opening the vehicle's door was "not authorized under any exception to the warrant requirement," stating that "[n]othing about the encounter described herein can be deemed a consensual police-citizen encounter." *Id.* at *7, 8. *Shouse* appears to be premised on the conclusion based on the facts that opening the car door effected a seizure. *See id.* at *7-8. In *State v. Lowe*, on the other hand, this court concluded that law enforcement permissibly opened a vehicle door when the defendant was found unresponsive in the driver's seat. *State v. Lowe*, 439 S.W.3d 326, 330 (Tenn. Crim. App. 2013), *perm. app. denied* (Nov. 19, 2013). In *Lowe*, the police officer had received information from a neighbor that an unconscious and possibly deceased person was parked in a running car. *Id.* at 328. The officer knocked on the car window and receiving no response, opened the door. *Id.* He was greeted by the scent of alcohol. *Id.* This court concluded that the action in opening the car door was justifiable under the community caretaking function. *Id.* at 330. Once the door was opened, the smell of alcohol provided reasonable suspicion to effect a seizure. *Id.* The defendant urges us to conclude that this case is more similar to *Shouse* because there was no citizen complaint to initiate the contact with law enforcement.

We do not find the presence of a citizen complaint to be the distinguishing factor in this case. Officer Boyd was able to observe firsthand some of the same facts conveyed by the citizen in *Lowe* — that the defendant was in the driver's seat of a running car, that he was unconscious, and that he was unresponsive to speech. Insofar as the defendant

8

asserts that *Shouse* stands for the proposition that a police-citizen encounter is not consensual unless the citizen gives prior, explicit consent, we disagree.

The Tennessee Supreme Court in *Moats* described exactly this type of interaction — that is, "approaching parked cars when the driver appears incapacitated or sick or the car is functioning improperly" — as falling under the third-tier, consensual police-citizen interactions under the community caretaking doctrine. *Moats*, 403 S.W.3d at 187 (quoting Mary Elisabeth Naumann, *The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception*, 26 Am. J.Crim. L. 325, 339 (1999)). *See also State v. Kenneth McCormick*, M2013-02189-CCA-R3-CD, 2015 WL 1543325, at \*5 (Tenn. Crim. App. Apr. 2, 2015) *perm. app. filed* (Tenn. June 1, 2015) (concluding that when an officer approached a car which was parked in the roadway with the engine and headlights on and then knocked on the window and opened the door to get a response from the unconscious defendant, the officer was engaged in community caretaking). We conclude that under *Moats*, Officer Boyd's actions in approaching the vehicle, speaking to the defendant, and finally attempting to rouse him by shining a light on him and lightly shaking him were permissible as a consensual police-citizen encounter.

When Officer Boyd first approached the defendant's vehicle, which was stopped in a public roadway, the defendant had the right to "decline to listen to the questions at all" and was entitled to "go on his way." *Daniel*, 12 S.W.3d at 425 (Tenn. 2000) (quoting *Royer*, 460 U.S. at 498). So long as a reasonable person would have felt free to disregard the officer, there was no seizure. *Williams*, 185 S.W.3d at 315. We conclude that a reasonable person who had fallen asleep in a public place would have felt free to leave after being awoken by a law enforcement officer under the totality of the circumstances present in this case.

A third-tier, consensual encounter may turn into a seizure if the actions of law enforcement are such that a reasonable person would not feel free to leave. *Daniel*, 12 S.W.3d at 427. When Officer Boyd repeatedly told the defendant to turn off the car, the encounter became an investigatory stop. Despite the defendant's subsequent attempt to close the door on Officer Boyd, a *reasonable* person in the defendant's position would not have felt free to leave once law enforcement had given an order to turn off the car. Accordingly, we must determine whether Office Boyd possessed reasonable suspicion at the point when he ordered the defendant to turn off the car.

Reasonable suspicion must be supported by specific and articulable facts supporting the inference that a criminal offense has been or is about to be committed. *Moats*, 403 S.W.3d at 178. Reasonable suspicion is more that an "inchoate and unparticularized suspicion or 'hunch.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 27

9

(1968)). Determining the existence of reasonable suspicion is a fact-intensive and objective analysis. *Day*, 263 S.W.3d at 903. The court must consider the totality of the circumstances, including "the objective observations of the police officer, information obtained from other officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders," in evaluating the presence of reasonable suspicion. *Id.*

Here, Officer Boyd observed a car which was stopped in the roadway[1] of a dead-end residential street at around 3:51 a.m. The car's brake lights were illuminated, and all four tires were in the roadway. When Officer Boyd approached the vehicle, he noticed it was running. However, both the driver and the passenger were slumped over and unconscious. Attempts to rouse the defendant verbally failed. So did an attempt to rouse the defendant by shining a bright strobe light in his eyes. When Officer Boyd shouted "hey" at the defendant, the defendant opened his eyes, gave Officer Boyd a "blank" look, and shut his eyes again. The defendant's eyes were bloodshot. Officer Boyd shook the defendant to wake him. The defendant began to mumble, and Officer Boyd described the defendant's speech as slurred. We conclude that, considering the totality of the circumstances, Officer Boyd had reasonable suspicion of wrongdoing sufficient to support an investigatory stop at the time that he ordered the defendant to turn off the car. Accordingly, the trial court did not err in denying the motion to suppress.

## CONCLUSION

Because Officer Boyd's interaction with the defendant prior to the time the defendant was seized was a consensual police-citizen encounter and because the seizure was supported by reasonable suspicion, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

---

[1] While the State on appeal premises the legality of the seizure in part on the placement of the defendant's vehicle, we note that the trial court found that "the Officer didn't really testify to" the fact that the vehicle was violating any laws through its placement, and the court refused to make findings on whether the placement of the vehicle gave rise to reasonable suspicion. We further note that the violation which the State relies on, Brentwood Municipal Code section 66-290, appears to be a civil offense. *See Clark v. Metro. Gov't of Nashville & Davidson County*, 827 S.W.2d 312, 315 (Tenn. Ct. App. 1991); Brentwood Municipal Code §§ 66-66, 66-67, 1-9.