IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 23, 2015

## STATE OF TENNESSEE v. TRACY LYNN CARMAN-THACKER

**Appeal from the Circuit Court for Coffee County**
**No. 39962    Vanessa Jackson, Judge**

_____

**No. M2014-01859-CCA-R3-CD – Filed September 8, 2015**

_____

The Defendant, Tracy Lynn Carman-Thacker, was convicted in a bench trial in the Coffee County Circuit Court of twelve counts of unlawful possession of a firearm while subject to an order of protection and twelve counts of violating an order of protection by possessing a firearm, all Class A misdemeanors. *See* T.C.A. §§ 39-13-113 (2014) (violation of an order of protection or restraining order), 39-17-1307 (Supp. 2012) (amended 2014) (unlawful carrying or possession of a weapon).  On appeal, the Defendant contends that the trial court erred in denying her motion to suppress the evidence found during a search of her house and that the evidence is insufficient to support her convictions.  We vacate the Defendant's convictions and dismiss the charges.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed;**
**Convictions Vacated; Charges Dismissed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

J. Bradley Hannah, Tullahoma, Tennessee, for the appellant, Tracy Lynn Carman-Thacker.

Herbert H. Slatery III, Attorney General and Reporter; Clark Bryan Thornton, Assistant Attorney General; C. Michael Layne, District Attorney General; Jeffrey T. Ridner, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Defendant was tried jointly with her codefendant, Tina Lippart.  Ms. Lippart was charged with being a felon in possession of a firearm.

At the trial, Coffee County Sheriff Steve Graves testified that on September 26, 2012, the Defendant asked if she could check on property she owned because she thought it had been abandoned by its occupants, her sister and niece. Other evidence showed that the Defendant was prohibited pursuant to orders of protection issued on July 9, 2012, from contacting her sister and niece. Sheriff Graves told the Defendant that the better course was to have a third party check the residence, and that if it had been abandoned, she should go through the legal process of reclaiming it.

Deputy James O'Neal testified that on September 26, 2012, he responded to a call regarding an unspecified civil matter. He said that when he arrived at 731 Ferrells Loop Road, the Defendant and Ms. Lippart were present. He said he spoke with the Defendant, who "refused [his] service." Deputy O'Neal advised his supervisor that the Defendant had requested another deputy respond to the call. Deputy O'Neal said his supervisor advised him that the Defendant's call had been answered and that she had refused service.

Deputy O'Neal said that shortly thereafter, he received a call regarding a violation of an order of protection on General Lee Drive. He said he responded to the call and was advised that about ten minutes before his arrival, the Defendant and Ms. Lippart had pulled to the edge of the front yard of a residence on General Lee Drive, that verbal communication and gestures had occurred, and that the Defendant and Ms. Lippart had sped off, slinging gravel.

Deputy O'Neal said he returned to the Defendant's house and encountered Ms. Lippart outside. He asked if the Defendant was home, and Ms. Lippart said she was not. Deputy O'Neal said that because Ms. Lippart was on probation and had signed a "contract" which allowed her house to be searched at any time and because Ms. Lippart admitted living in the house, he told Deputies Dodson and Raline to enter the house to check for contraband. Deputy O'Neal said Deputy Raline advised him that two handguns were on the dresser in a bedroom, a third handgun was on a cedar chest at the foot of the bed, and two shotguns were behind the door of the bedroom. Deputy O'Neal said that Deputies Dodson and Raline found the Defendant and that the Defendant told Deputy O'Neal another handgun was underneath a cloth next to a chair in the living room. Deputy O'Neal said that none of the firearms were secured, that a large amount of ammunition was present, that the handguns were loaded, and that the shotguns were unloaded.

Deputy William Raline testified that on September 26, 2012, he received a call from the dispatch center regarding a violation of two orders of protection at Lakewood Park. He said he drove to that location and was met by Megan Carman, who explained to

him that the Defendant had violated her order of protection by approaching the property in a red truck and screaming and yelling at her. Other evidence showed that Megan Carman was the Defendant's niece. Deputy Raline said he confirmed the order of protection was active and went to the Defendant's house. He entered the home and checked for weapons. Deputy Raline said he found two handguns on a dresser, a third handgun at the foot of the bed on a piece of furniture, two shotguns against the wall behind the door, and several boxes of ammunition. He said that another deputy discovered a fourth handgun in the living room area. He found the Defendant hiding in a closet in a child's bedroom.

Stephen Darrow, who was Ms. Lippart's probation officer, testified that he began supervising Ms. Lippart in July 2012. He reviewed the rules of probation with her on July 5. One rule provided, "I agree to a search, without a warrant, of my person, vehicle, property, or place of residence by any Probation/Parole officer or law enforcement officer, at any time." Ms. Lippart signed a document containing the rules. Mr. Darrow said that he asked for Ms. Lippart's address and that she provided 731 Ferrells Loop Road as her address "for contact purposes." The document she signed was received as an exhibit and reflected "probationer address" as 731 Ferrells Loop Road. Mr. Darrow said he did not physically inspect the residence at that address on the date she provided the address. He said, though, that he conducted "several initial home visits" but did not recall the dates. He agreed that a house sat at the center of the lot at 731 Ferrells Loop Road and that a camper was also on the property. He said that in December 2012, he went to the house at 731 Ferrells Loop Road and, although Ms. Lippart was inside the house when he arrived, she took him to an adjacent camper. He said that Ms. Lippart indicated the camper was where she slept, that her personal property was inside the camper, and that he accepted "on faith" the camper was her residence. Mr. Darrow said he did not know whether Ms. Lippart lived in the house or the camper on September 26, 2012, which was the date the sheriff's department searched the house. He said, though, that on July 16, 2012, Ms. Lippart reported that she lived with the Defendant and that she helped with the Defendant's children.

The Defendant testified that she owned the house at 731 Ferrells Loop Road, where she lived with her two children. She said that the house had three bedrooms and that she and her children each had a bedroom.

The Defendant testified that three of the handguns and the two shotguns were found in her bedroom. She said she had a Florida handgun carry permit. She said that she did not know that the orders of protection prohibited her from carrying a firearm and that the judge had not mentioned a restriction on weapons when the orders of protection were issued. With respect to the orders of protection, she said the trial judge had not checked

the box next to the section pertaining to firearms. She said that ordinarily, she carried a firearm on her person or in her vehicle, but when the orders of protection took effect, she took the firearms out of her vehicle and kept them in her home. On cross-examination, she reviewed the order of protection and acknowledged that it contained "subtitles" that prohibited her from possessing firearms. She was aware that her codefendant was on felony probation and that felons were not supposed to have access to firearms.

The Defendant testified that on the day of the search, she gave her keys to Ms. Lippart because the Defendant was inside and Ms. Lippart was working in the yard. The Defendant said the key ring contained keys to the outbuildings. She said Ms. Lippart lived in the camper and did not have access or a key to the Defendant's house unless the Defendant allowed her inside. The Defendant said the keys that the deputies testified Ms. Lippart possessed were the Defendant's. The Defendant said that after a man's house burned, she let him use the camper, at which point Ms. Lippart moved into the Defendant's house. She thought Ms. Lippart moved into the house in December 2012.

When asked about hiding in the closet, the Defendant said she and Deputy O'Neal did not "see eye to eye." She said she was "avoiding" the police because she did not want to have "another encounter" with Deputy O'Neal.

Tina Lippart testified that she lived in a camper at 731 Ferrells Loop Road on September 26, 2012. She said that when she was released from jail, she met with Mr. Darrow. She said she gave him the address 731 Ferrells Loop Road and told him she lived in a camper on the property. She said that she had no access to the Defendant's house unless the Defendant was home and that she did not have a key to the house. She said she did not go inside the house except to shower and eat.

Ms. Lippart testified that on September 26, 2012, she had the Defendant's keys because Ms. Lippart had driven the Defendant's truck. She said that she told the officers, "I live here," but that they did not give her time to explain she lived in the camper. She said the officers asked for keys to the house and conducted a patdown search. She said that the officers asked for consent to search and that she told them, "No. It's not my property. I'm not the homeowner." She said the officers went through the keys on the key ring, found the house key, and entered the house while she was handcuffed and detained in the back of a police car. She said September 26 was the only day she possessed the keys. She said the Defendant had given her the keys about fifteen to twenty minutes before the police arrived. She acknowledged she lied to the police when she told them that the Defendant was not home and that she did not have a house key.

The trial court found the Defendant guilty of twelve counts of unlawful possession of a firearm while subject to an order of protection and twelve counts of violating an order of protection by possession of a firearm. This appeal followed.

## I

## Denial of the Motion to Suppress

The Defendant contends, in related issues, that the trial court erred in denying her motion to suppress the evidence seized during the search of her house for two reasons: (1) the entry was illegal because Ms. Lippart was not a resident and lacked authority to consent to the search, and (2) even if Ms. Lippart was a resident, the search of the bedrooms exceeded the scope of the consent she could have provided. The State has failed to respond to the merits of the Defendant's arguments relative to the legality of the search.

Pursuant to the Fourth Amendment to the United States Constitution:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Likewise, Article 1, section 7 of the Tennessee Constitution provides:

That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty[.]

These constitutional protections "safeguard the privacy and security of individuals against arbitrary invasions of government officials." *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967); *see State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997). "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotations omitted). The "fruit of the poisonous tree" doctrine provides that the exclusionary rule may bar the admission of evidence obtained through exploitation of an unlawful search or

seizure. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *State v. Clark*, 844 S.W.2d 597, 600 (Tenn. 1992); *State v. Ellis*, 89 S.W.3d 584, 592 (Tenn. Crim. App. 2000).

Despite the general principle that the police cannot search a home without obtaining a warrant, our courts have identified narrow exceptions to the warrant requirement. *See State v. Bartram*, 925 S.W.2d 227, 229-30 (Tenn. 1996) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971)). One such exception exists for a search conducted pursuant to a valid consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

At the suppression hearing, Sheriff Graves, Deputy O'Neal, Deputy Raline, and Mr. Darrow testified. Their hearing testimony was consistent with their trial testimony. Deputy O'Neal testified in more detail at the suppression hearing regarding the circumstances attending the search. According to his hearing testimony, Ms. Lippart twice responded affirmatively when asked if she lived at the "residence." He said the officers asked for permission to search the premises "for weapons or contraband" pursuant to Ms. Lippart's probation agreement. He said Ms. Lippart "responded that the doors were locked, and she did not have a key." He said another officer found a set of keys when frisking Ms. Lippart and that when asked, Ms. Lippart denied that one of the keys would unlock the door of "her residence." The Defendant and Ms. Lippart did not testify at the suppression hearing. Their trial testimony regarding the living arrangements at the Defendant's house and camper is summarized above.

The Defendant contends that Ms. Lippart could not consent to a search of the house because she was not a resident. Consent for a warrantless search may be given by the defendant or by "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974); *see State v. Talley*, 307 S.W.3d 723, 734 (Tenn. 2010). Common authority is shown by

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock*, 415 U.S. at 172 n.7; *see Bartram*, 924 S.W.2d at 231.

The Defendant's challenges relate to the validity of Ms. Lippart's consent, by virtue of the signed probation agreement, for a warrantless search of the Defendant's residence. When a person has signed a probation agreement providing written consent for a warrantless search of the person's residence, such a search may be conducted if reasonable suspicion for the search exists. *U.S. v. Knights*, 534 U.S. 112, 121 (2001); *State v. Davis*, 191 S.W.3d 118, 121 (Tenn. Crim. App. 2006). This is in contrast to the higher probable cause standard required to obtain a search warrant for the residence of an ordinary citizen.

In the present case, the State failed to elicit testimony from the officers about any facts upon which they formed a reasonable suspicion that Ms. Lippart had engaged or was engaging in criminal activity justifying a search of the house. We acknowledge that Deputy O'Neal testified that he received information when he responded to the call regarding the violation of an order of protection that the Defendant and Ms. Lippart had pulled to the edge of a residence on General Lee drive, had engaged in a verbal altercation and gesturing with the subject of an order of protection, and had slung gravel when they sped away. We note, however, that the Defendant, not Ms. Lippart, was restrained by the orders of protection. The record does not show that at the time the officers searched the house, they had reasonable suspicion that Ms. Lippart had engaged or was engaging in criminal activity. We likewise note that Ms. Lippart was eventually charged with being a felon in possession of a firearm, an offense unrelated to the alleged events on General Lee Drive and for which the evidence was discovered only as a result of the search.

In denying the motion to suppress, the court stated:

I certainly understand [defense counsel's] contention that Ms. Lippart lived in the camper, but as for the testimony today, the clear testimony of all the officers that testified was that she said she lived in the residence. She may have at one point in time lived in the camper, but on that day, she affirmatively – the only evidence I have is that she affirmatively stated she lived in the residence.

So I believe based upon that and based upon this Article 7 [in the Probation Order signed by Ms. Lippart] in which she agreed to a warrantless search of her person and residence that the officers had a right to enter that residence without a warrant on that day.

Thus, it appears that the trial court presumed Ms. Lippart's prior written consent in the probation agreement was sufficient and that the court did not analyze the existence of reasonable suspicion.

As we have stated, a warrantless search of a home is presumptively unreasonable. *Payton*, 445 U.S. at 586. The State did not adduce evidence at the suppression hearing or the trial to establish the officers' reasonable suspicion to search the house, and the question of whether Ms. Lippart lived in it is irrelevant. The facts show that the sole basis of the purported consent was the signed probation agreement. Even if Ms. Lippart "possessed common authority over or other sufficient relationship to the premises," the officers' search of the house did not comport with constitutional limits in the absence of reasonable suspicion. *See Matlock*, 415 U.S. at 171.

We conclude that the trial court erred in denying the motion to suppress. Because the search was not supported by reasonable suspicion, we will not consider the Defendant's contention that the search exceeded the scope of any consent given by virtue of the probation agreement.

Were the search issue the only question before us, we would vacate the convictions and remand the case for such further proceedings as the State may elect to pursue in which the evidence is suppressed. For reasons that we will explain in Section II, however, a broader flaw exists that requires dismissal of the charges by this court.

## II

### Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support her convictions. She argues that neither her sister nor her niece were her "intimate partner" pursuant to the relevant statute prohibiting weapons possession by a person subject to a restraining order. The state concedes the merit of the Defendant's argument.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

The Defendant was convicted under Tennessee Code Annotated sections 39-17-1307(f)(1)(B) and 39-13-113(h)(1). Tennessee Code Annotated section 39-17-1307(f)(1)(B) states that a person commits an offense who possesses a firearm and "[i]s, at the time of the possession, subject to an order of protection that fully complies with 18 U.S.C. § 922(g)(8)[.]" Tennessee Code Annotated section 39-13-113(h)(1) states that "[i]t is an offense and a violation of an order of protection for a person to knowingly possess a firearm while an order of protection that fully complies with 18 U.S.C. § 922(g)(8) is entered against that person and in effect[.]"

The federal statute referred to in the Code states:

(g)     It shall be unlawful for any person—

. . .

(8)     who is subject to a court order that—

(A)    was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

(B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

(C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

(ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury[.]

18 U.S.C. § 922(g)(8).  The United States Code also provides:

The term "intimate partner" means, with respect to a person, the spouse of the person, a former spouse of the person, an individual who is a parent of a child of the person, and an individual who cohabitates or has cohabitated with the person.

18 U.S.C. § 921(a)(32).

The record reflects that the Defendant was subject to a valid order of protection. As we have stated, the State prosecuted the Defendant for violating an order of protection by possessing a firearm pursuant to Tennessee Code Annotated sections 39-13-113(h)(1) and 39-17-1307(f)(1)(B).  The State did not prosecute the Defendant pursuant to the more general option of knowingly violating an order of protection pursuant to section 39-13-113(a)(1). For purposes of dispossession of firearms, an otherwise valid order of protection must comply with the additional requisites of 18 United States Code section 922(g)(8). *See Anna Lois Long v. Sammy Lee Brown*, No. E2013-00802-COA-R3-CV, 2014 WL 295713, at *7 (Tenn. Ct. App. Jan 28, 2014) (recognizing the validity of an order of protection notwithstanding its lack of full compliance with 18 U.S.C. § 922(g)(8).  The relevant order in the present case does not.

-10-

As we have stated, the parties agree that the orders of protection in this case are not for the protection of an intimate partner of the Defendant or child of an intimate partner of the Defendant, as contemplated by the federal statute. The record reflects that the Defendant's sister and niece were issued orders of protection against the Defendant. The charges in this case relate to an order of protection for the benefit of Megan Carman, the niece. Deputy Raline identified Megan Carman as the complainant at General Lee Drive on September 26, 2012, and the record contains an order of protection restraining the Defendant from contact with Megan Carman. A niece is not a relative listed in the relevant federal statute as an intimate partner, and no evidence was presented to show that Ms. Carman cohabitated or had cohabitated with the Defendant.

The offenses of which the Defendant was convicted required that the Defendant possesses a firearm while she was subject to "an order of protection that fully complies with 18 U.S.C. § 922(g)(8)." *See* T.C.A. §§ 39-13-113(h)(1), 39-17-1307(f)(1)(B). The State failed to establish that the Defendant was subject to an order that fully complied with the federal statute. The evidence was insufficient to support the verdict as a matter of law.

In consideration of the foregoing and the record as a whole, we reverse the judgments of the trial court, vacate the convictions, and dismiss the charges.

_____
ROBERT H. MONTGOMERY, JR., JUDGE