FILED

08/08/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 9, 2017 Session

## STATE OF TENNESSEE v. KENDALL J. SUMMERS

**Appeal from the Circuit Court for Giles County**
**No. 12770    Stella L. Hargove, Judge**

---

### No. M2016-02175-CCA-R3-CD

---

The Defendant, Kendall J. Summers, appeals from the Giles County Circuit Court's revocation of his probation for his convictions for possession with the intent to sell 0.5 gram or more of methamphetamine, initiation of the process to manufacture methamphetamine, and felony possession of drug paraphernalia and its order that he serve the remainder of his effective eight-year sentence in confinement. The Defendant contends that the trial court abused its discretion by revoking his probation. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Claudia S. Jack, District Public Defender; Hershell Koger (on appeal and at revocation hearing), Assistant Public Defender; and Brandon E. White (on appeal), Columbia, Tennessee, for the appellant, Kendall J. Summers.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Brent A. Cooper, District Attorney General; and Jonathan Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On June 10, 2015, the Defendant was indicted for possession with the intent to sell 0.5 gram or more of methamphetamine, initiation of the process to manufacture methamphetamine, and felony possession of drug paraphernalia. On September 21, 2015, the Defendant pleaded guilty as charged in exchange for an effective eight-year sentence with one year to serve in confinement and the remainder to be served on probation. On August 1, 2016, a probation violation report was filed with the trial court, alleging that the Defendant had been arrested on July 18, 2016, and charged with "distribution" of a

controlled substance, unlawful possession of a weapon, and possession of drug paraphernalia. An arrest warrant for the violation was issued on August 2, 2016.

The Defendant filed a motion to suppress the evidence obtained during the July 18, 2016 incident for purposes of the probation violation allegation. The suppression motion alleged that the police did not have legal grounds to search the Defendant's car during a traffic stop, which resulted in the Defendant's arrest for distribution of a controlled substance and for possession of drug paraphernalia. The motion also alleged that the police did not have legal grounds to search the Defendant's home, which resulted in the Defendant's arrest for unlawful possession of a firearm. The motion to suppress was addressed at the revocation hearing.

At the hearing, Probation Officer Ti Rohasek testified that he supervised the Defendant but that he had never personally met the Defendant because he had only supervised the Defendant since the beginning of July 2016. Mr. Rohasek said that this was the Defendant's first probation violation allegation and that the Defendant had no difficulty reporting to his previous probation officer or paying his fees. Mr. Rohasek agreed the probation violation report was based solely upon the July 18 incident.

On cross-examination, Mr. Rohasek testified that before the July 18 incident, he was contacted by Ardmore Police Officer Billy Grenko, who expressed concern that the Defendant was possibly involved with methamphetamine. Mr. Rohasek said that he and Officer Grenko discussed the condition of the Defendant's probation that required the Defendant to agree to a search of his "person, vehicle, property or place of residence by any probation/parole officer or law enforcement officer at any time." Mr. Rohasek explained to the officer that if the Defendant refused a search, the Defendant would be in violation of his probation. Mr. Rohasek denied telling Officer Grenko that the police had "carte blanche" to search the Defendant and said he told the officer that he did not know how the rules of probation related to the police department.

Ardmore Police Officer Billy Grenko testified that he had worked in law enforcement for about four years and that he initiated the July 18 traffic stop of the Defendant. Officer Grenko said that before the traffic stop, the police department received several complaints about "strange activity" occurring at the Defendant's home and that surveillance was conducted relative to the "comings and goings" at the Defendant's home. Officer Grenko said that he contacted Mr. Rohasek on July 18 to confirm whether the Defendant was on probation and to obtain a copy of the rules of the Defendant's probation. Officer Grenko said that he reviewed the probation rules to which the Defendant agreed and noticed that the Defendant agreed to allow law enforcement to search the Defendant, his vehicle, and his property. Officer Grenko decided to conduct a traffic stop.

Officer Grenko testified that he requested Sergeant Luna to conduct the traffic stop when the Defendant left his home. Officer Grenko said that although the suspicion of drug activity was what drew his attention to the Defendant, the traffic stop was made based upon the rules of the Defendant's probation. Officer Grenko acknowledged he arrested the Defendant for the underlying 2015 charges for which the Defendant received probation. Officer Grenko searched the Defendant's car and found a "fake book in the back of the car that had a hidden safe inside of it." Officer Grenko said that he retrieved the Defendant's keyring, that he opened the safe with one of the Defendant's keys, and that the safe contained almost three-quarters of one gram of methamphetamine, scales, and plastic bags. The safe was inside the trunk.

Officer Grenko testified that Michaela Gooseby, the Defendant's girlfriend, was inside the car and that the car was registered to the Defendant's mother. Officer Grenko said that he spoke to Ms. Gooseby but could not recall the conversation and that the Defendant ultimately admitted owning the safe, although he initially denied owning it.

Officer Grenko testified that he contacted Mr. Rohasek and the police chief to inform each of them about the methamphetamine and that "we" decided to search the Defendant's bedroom at his mother's home. Officer Grenko said that the Defendant's mother identified which bedroom belonged to the Defendant and that Officer Grenko found drug paraphernalia, including straws and scales, inside the room. Officer Grenko said that inside the bedroom closet, he found a safe, that a key on the Defendant's keyring opened the safe, that Officer Grenko found a large amount of cash, methamphetamine, and a letter from the probation office addressed to the Defendant. Officer Grenko stated that the substances found in each safe were field tested and were positive for methamphetamine and that the Tennessee Bureau of Investigation (TBI) laboratory later confirmed the positive field-test result. The total weight was twenty-three grams.

Officer Grenko testified that he did not wait for the Defendant to commit a traffic violation before initiating a stop because he suspected the Defendant was involved with methamphetamine and because the Defendant's probation agreement permitted searches by law enforcement officers. Officer Grenko said the Defendant's bedroom was searched based upon the methamphetamine found inside the Defendant's car and upon the probation agreement signed by the Defendant. Officer Grenko said he relied on the rules of probation to search the home in lieu of obtaining a search warrant for the Defendant's bedroom.

On cross-examination, Officer Grenko testified that the complaints received by the police department were mostly neighbors calling to report frequent traffic at the Defendant's home at all hours of the night. He said that the complaints began about two weeks before the traffic stop, that he began patrolling the area at night, and that he performed surveillance from a vacant home about 200 yards down the street from the Defendant's home. He said he

worked from 5:00 p.m. to 1:00 a.m. at this time. He said that the increased traffic at the Defendant's home usually began around 10:00 p.m. but sometimes earlier. He noted that the cars stayed at the home one or two minutes. He said that on the day of the Defendant's arrest, he saw one or two cars at the Defendant's home during the daytime surveillance.

Officer Grenko testified that the Defendant was told he was stopped by the police because he was on probation and because they were investigating suspicious activity. Officer Grenko said that the Defendant declined to consent to a search of the car, that the Defendant initially would not provide consent, that Officer Grenko showed the Defendant a copy of the "probation agreement" and reminded the Defendant that he agreed to a search, and that the Defendant never consented to a search of his car. Officer Grenko said law enforcement searched the car and the Defendant based upon the probation agreement.

Officer Grenko testified that nothing unlawful was found on the Defendant, that the backseat "just let down" during the search of the car, and that a book was found inside the trunk near the backseat. He said that he obtained the key to the trunk from the Defendant, that the book was a hidden safe, and that 0.75 gram of methamphetamine was inside the safe. Officer Grenko said that scales and small plastic baggies were inside the car, as well. He said the Defendant was taken into custody and transported to the police station.

Officer Grenko testified that he, Ms. Gooseby, and Sergeant Luna drove to the Defendant's mother's home and that the Defendant was told the police were going to search the home. Officer Grenko could not recall whether he asked for the Defendant's consent to search the Defendant's home but noted the Defendant consistently objected to the search of the car. Officer Grenko said that the Defendant's mother was home when they arrived, that Ms. Gooseby went inside and returned with the Defendant's mother, and that Officer Grenko explained why the officers were there. Officer Grenko said that he told the Defendant's mother that the Defendant had been in possession of drugs and that they were going to search the Defendant's bedroom based upon the probation agreement. He said the Defendant's mother did not say anything but showed the officers which bedroom belonged to the Defendant.

Officer Grenko testified that straws, scales, and plastic baggies were found inside the Defendant's bedroom and that inside a closest, he found a safe, which was unlocked by a key on the Defendant's keyring. Officer Grenko said he opened the safe and found a .38-caliber pistol, methamphetamine, approximately $800 cash, and a letter from the probation office addressed to the Defendant.

Michaela Gooseby, the Defendant's girlfriend, testified that she and the Defendant had been in a romantic relationship for about two years and that she was a passenger inside the Defendant's car when the traffic stop occurred. She recalled that Sergeant Luna

immediately asked her and the Defendant to get out of the car and that she and the Defendant were separated. She said she did not hear the Defendant's conversation with the officers. She said that the officers searched the car, that something was found inside the car, and that the officers placed the Defendant in a police car. She said that after the Defendant was placed inside the police car, she asked the officers what was going to happen. She said the officers explained they were waiting for another officer to arrive to take the Defendant to the police station. She said the officers told her that she was going to drive the Defendant's car to the Defendant's mother's home, that the officers would follow her, and that the officers were going to search the Defendant's bedroom. She said that her car was at the Defendant's mother's home and that the officers told her she was free to leave when they arrived at the Defendant's mother's home.

Ms. Gooseby testified that she drove the Defendant's car to his mother's home and that she attempted to get inside her car to leave but that the officers asked her to let them inside the home or to wake the Defendant's mother. Ms. Gooseby said that she knocked on the locked back door, that nobody came to the door, and that she walked around to the front door and knocked on the door. Ms. Gooseby said that the Defendant's mother did not answer the door but that the door was unlocked. She said that she walked inside the home and toward the Defendant's mother's bedroom door, that she intended to knock on the bedroom door, and that Sergeant Luna followed her into the home. Ms. Gooseby said that it took a couple minutes for the Defendant's mother to wake, that the Defendant's mother came out of her bedroom, that the Defendant's mother and the officers spoke, and that Ms. Gooseby left the home after a couple of minutes. Ms. Gooseby recalled the officer's asking permission to search the home and the Defendant's mother replying, "No." Ms. Gooseby said the search of the home occurred around 8:30 or 9:00 p.m.

Leslie Summers, the Defendant's mother, testified that she did not care for Ms. Gooseby, that Ms. Gooseby had never lived at her home, and that Ms. Gooseby did not have permission to enter her home or to give permission to anyone else to enter her home. Ms. Summers said that on the night of the search, she went to bed around 7:30 or 8:00 p.m. because she woke at 3:30 a.m. for work. She said Ms. Gooseby woke her, explained that the Defendant had been arrested and that the police were at the home, and left the bedroom.

Ms. Summers testified that she walked to the living room, that two police officers were standing there, that she placed her dogs inside her bedroom because they were barking, and that the officers explained that the Defendant had been arrested and that the officers were there to search the home. She said that she told the officers that they could not search her home and that the officers responded, "Oh, yes we can. He's on probation. We have access anytime to this house." She said that she identified the Defendant's bedroom and that the discussion ended. She said the officers only searched the Defendant's bedroom and found a safe inside the closet. She said that the safe belonged to her former boyfriend and that she

owned the pistol. She explained that her former boyfriend bought the gun for her one or two years before the search, that their relationship ended two weeks before the search, that he wanted his safe and the pistol, and that she agreed to return both items.

On cross-examination, Ms. Summers testified that the safe opened with a key and that she placed it in the Defendant's bedroom closet because she used that closet for storage. She said she told the officers that the safe belonged to her former boyfriend and that the gun belonged to her. She said the keyring the Defendant had on the night of the searches belonged to her and that the Defendant had the keyring because he was driving her car. She denied owning the methamphetamine found inside the bedroom safe and inside the car safe. She did not know who owned the methamphetamine found inside her car and did not know a safe was inside the trunk. She did not know the Defendant admitted owning the safe and the methamphetamine found inside the trunk at the time the officers searched her home.

Ms. Summers testified that she did not think she had ever looked inside the bedroom safe. She recalled that her boyfriend brought the safe to her home and that it was stored in the spare bedroom, which became the Defendant's bedroom when he moved in about two months before the search. She denied knowing who owned the methamphetamine and said her former boyfriend did not use drugs. She agreed the Defendant had a "big meth problem."

Ms. Summers testified that the Defendant had been on probation for about one year at the time of the hearing but that she had never seen anyone from the probation office. She said, though, someone from the probation office came to her home for "a visit" when she was at work. She recalled receiving a telephone call from the Defendant's probation officer, who asked if the Defendant lived with her and requested the Defendant be home when the officer came for the visit. She denied giving the probation officer consent to search her home and said the Defendant told her that the officer did not show up on the scheduled date. She agreed she assumed the probation officer would search her home. She said the Defendant mentioned to her that because he was on probation, the probation officer might search the home when the officer came for a home visit. She said, though, she did not want the police officers searching her home that night because the Defendant was not home and because she understood the Defendant had to be present in order for a search to be conducted.

The probation order was received as an exhibit. The order reflects the "general and specific conditions of Probation," and states, in relevant part, "I agree to a search, without a warrant, of my person, vehicle, property, or place of residence by a Probation/Parole Officer or law enforcement officer, at any time." The order reflects the Defendant's signature acknowledging that "I have read or have had read to me, the conditions of my Probation. I fully understand them and agree to comply with them. I hereby waive all extradition rights and process and agree to return to Tennessee if at any time during my probation the Trial Judge directs me to do so."

The trial court determined that the case law required a showing of reasonable suspicion and a link with the reason a defendant is on probation before a search could be lawful. The court determined, based upon the rule of probation permitting a search, that the traffic stop, the search of the car, and the immediate search of the Defendant's mother's home were lawful. The court determined that the limited surveillance that was conducted based upon information received by the police established reasonable suspicion to stop and briefly question the Defendant, who was on probation. The court determined that the searches of the car and the home where the Defendant had lived for two months were proper.

The trial court noted that the Defendant was serving his sentence on "felony probation" and that as a result, the Defendant did not "enjoy the rights of ordinary citizens[.]" The court said that the Defendant was a convicted felon as a result of his pleading guilty to possession with the intent to sell methamphetamine, the initiation of the manufacture of methamphetamine, and felony possession of drug paraphernalia and that this first revocation warrant was filed less than one year after the Defendant was placed on probation. The court determined that the State sufficiently established the new criminal charges related to the possession of methamphetamine and drug paraphernalia and to the unlawful possession of a firearm. The court also determined that the State sufficiently established that the Defendant failed to report his arrest to his probation officer. The court revoked the Defendant's probation and ordered him to serve the remainder of his sentence in confinement. This appeal followed.

## I. Motion to Suppress

The Defendant contends that the trial court erred by denying his motion to suppress. He argues that the police officers who initiated the traffic stop did not possess reasonable suspicion to believe the Defendant was engaged in criminal activity and that the condition of probation requiring the Defendant to consent to a search did not provide the police with carte blanche to perform searches of the Defendant, his property, or his home. The State responds that the evidence obtained during the searches was properly considered by the trial court because the evidence was not obtained as a result of police harassment or in a particularly offensive manner.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that

evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

## A.    The Legality of the Search

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. Warrantless seizures are "presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the . . . seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997); *see Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000).

Despite the constitutional protection from unreasonable searches, "inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." *State v. Knight*, 534 U.S. 112, 119 (2001) (internal quotation marks and citation omitted). A trial court, therefore, is permitted to "impose reasonable conditions [of probation] that deprive the offender of some freedoms enjoyed by law-abiding citizens." *Id*. A defendant released on probation has a diminished protection from warrantless searches. *Id*. at 121. A search of a probationer's home "requires no more than reasonable suspicion . . . [to] the degree . . . [that] there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." *Id*.; *see United States v. Cortez*, 449 U.S. 411, 418 (1981). Therefore, "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable" within the meaning of the Fourth Amendment. *Knight*, 534 U.S. at 121; *see State v. Willie Clark Bennett*, No. E2010-00859-CCA-R3-CD, 2011 WL 1045646 (Tenn. Crim. App. Mar. 22, 2011).

The record reflects that in September 2015, the Defendant pleaded guilty to methamphetamine-related offenses and received an eight-year sentence of split confinement. The probation order signed by the Defendant reflected that the Defendant agreed to warrantless searches of his person, vehicle, property, and home by probation and law enforcement officers at any time. After the Defendant served one year in confinement, he was released to serve the remainder of his sentence on probation. In July 2016, the Ardmore

Police Department received several complaints about strange activity occurring where the Defendant lived. The complaints were mostly from neighbors reporting frequent traffic at all hours of the night at the Defendant's home. Officer Grenko began patrolling the neighborhood at night and conducted surveillance from a vacant home 200 yards from the Defendant's home. Officer Grenko observed that traffic usually increased at the Defendant's home around 10:00 p.m. and that the vehicles remained at the home one or two minutes. As a result of these observations and because of the Defendant's agreed upon conditions of probation, a traffic stop was conducted and the Defendant's car searched, which revealed methamphetamine and drug paraphernalia. Likewise, the Defendant's bedroom inside his mother's home was immediately searched after the traffic stop, and additional methamphetamine, drug paraphernalia, cash, and a firearm were found.

We conclude that because the Defendant signed the probation order, he agreed to unconditional warrantless searches of his person, vehicle, and home and that as a result, the police only needed to establish reasonable suspicion to justify the searches of the Defendant's car and bedroom. *See Knight*, 534 U.S. at 122. Officer Grenko possessed articulable reasonable suspicion to believe that the Defendant, who was serving his sentence on probation for methamphetamine-related offenses, was engaged in unlawful drug activity. The complaints received by the police department were investigated by police patrols and surveillance, and based upon this investigation, reasonable suspicion existed to conclude that criminal conduct was occurring. The trial court properly denied the motion to suppress in this regard.

## B.     Admissibility of Evidence at Probation Revocation Hearings

In *State v. Hayes*, 190 S.W.3d 665 (Tenn. Crim. App. 2005), this court determined whether the exclusionary rule applied in probation revocation hearings. The court noted that probation revocation hearings were "not part of the criminal prosecution process" because probation revocations were "remedial rather than punitive." *Id*. at 669 (citing *Morrissey v. Brewer*, 408 U.S. 471 (1972); T.C.A. § 40-35-311 (2003)). The court acknowledged that the rules of evidence were relaxed relative to the admissibility of evidence and that probationers were not "entitled to receive the full range of due process rights." *Hayes*, 190 S.W.3d at 669 (citing *Barker v. State*, 483 S.W.2d 586, 588-89 (Tenn. 1972)). Furthermore, the court stated that "[a]pplication of the exclusionary rule to probation revocation proceedings would, at most, discourage only the intentional search of probationers," "would decrease the State's power to ensure conformance with probation conditions by preventing a probationer from facing the consequences of disobedience," and "obstruct the court's ability to gauge a probationer's improvement or regression and compel probation officers to spend more time gathering admissible proof concerning those who violate conditions of probation." *Id*. at 670. The *Hayes* court, however, noted that law enforcement officers were not entitled to a "carte blanche exemption." *Id*. The court concluded that the exclusionary rule applies in

probation revocation hearings "when unlawfully obtained evidence results from police harassment or if the evidence is obtained in a particularly offensive manner." *Id.*; *see Willie Clark Bennett*, 2011 WL 1045646, at *6; *see also* T.C.A. § 40-35-311(d).

In this case, the record does not reflect that the evidence was obtained unlawfully. Furthermore, no proof shows that the evidence was obtained as the result of police harassment or in an offensive manner. Although Officer Grenko inquired whether the Defendant was on probation and whether the Defendant had consented to warrantless searches as a condition of probation, Officer Grenko investigated the complaints received by the police department and developed reasonable suspicion that the Defendant was involved in unlawful drug activity. The exclusionary rule was not applicable in this probation revocation hearing, and the trial court properly considered the evidence in determining the Defendant violated the conditions of his probation. The Defendant is not entitled to relief on this basis.

## II.      Probation Revocation

The Defendant contends that the trial court erred by determining that the Defendant failed to report his arrest to his probation officer. He argues that the probation violation report did not allege the failure to report the arrest, that the State offered no evidence showing a failure to report the arrest, that no substantial evidence supports the court's finding in this regard, and that the court improperly determined the Defendant violated his probation by failing to report his arrest. The State concedes that no evidence shows the Defendant failed to report his arrest to his probation officer but that the trial court properly revoked the Defendant's probation based upon the new criminal charges.

Our supreme court has concluded that a trial court's decision to revoke a defendant's probation "will not be disturbed on appeal unless . . . there has been an abuse of discretion." *State v. Harkins*, 811 S.W.2d 79, 82 (Tenn. 1991) (citing *State v. Williamson*, 619 S.W.2d 145, 146 (Tenn. Crim. App. 1981)). An abuse of discretion has been established when the "record contains no substantial evidence to support the conclusion of the trial judge that a violation of the conditions of probation has occurred." *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980); *see State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001); *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978). When a trial court finds by a preponderance of the evidence that a defendant has violated the conditions of probation, the court "shall have the right . . . to revoke the probation." T.C.A. § 40-35-311(e)(1) (2014). After revoking a defendant's probation, the trial court may return a defendant to probation with modified conditions as necessary, extend the period of probation by no more than two years, order a period of confinement, or order the defendant's sentence into execution as originally entered. T.C.A. §§ 40-35-308(a), (c), -310 (2014). "In probation revocation hearings, the credibility

-10-

of witnesses is for the determination of the trial judge." *Carver v. State*, 570 S.W.2d 872, 875 (Tenn. Crim. App. 1978) (citing *Bledsoe v. State*, 378 S.W.2d 811, 814 (Tenn. 1965)).

The record reflects that the trial court found, in relevant part, that the Defendant failed to report his new arrest to his probation officer. However, the probation violation report and the warrant alleged that the Defendant obtained new criminal charges related to methamphetamine, drug paraphernalia, and a firearm found during the searches of the Defendant's car and bedroom. The report did not allege the Defendant failed to report his arrest to his probation officer, and the State offered no proof at the revocation hearing that the Defendant failed to report his arrest. Therefore, we conclude that the trial court erred in relying on whether the Defendant failed to report his arrest in determining the Defendant violated the conditions of his probation.

The trial court's erroneous finding notwithstanding, the court also determined that the State had sufficiently established that the Defendant had possessed methamphetamine, drug paraphernalia, and a firearm, violating the conditions of the Defendant's probation. Officer Grenko's testimony reflects that after the methamphetamine and drug paraphernalia were found inside the trunk of the car, the Defendant admitted the items belonged to him, not Ms. Gooseby. Relative to the additional methamphetamine, drug paraphernalia, cash, and firearm found inside the Defendant's mother's home, the items were found inside the Defendant's bedroom closet in a safe. The safe also contained a letter addressed to the Defendant from the probation office. This evidence alone was sufficient to support the court's finding that the Defendant had violated his probation, and the court did not abuse its discretion by revoking the Defendant's probation. *See* T.C.A. § 40-35-311(e)(1). Once the court revoked the Defendant's probation, it had the authority to order the Defendant to serve the remainder of his sentence in confinement. *See* T.C.A. §§ 40-35-308(a), (c), -310. The Defendant is not entitled to relief.

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE