IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 21, 2025

## STATE OF TENNESSEE v. TAIVAUN MARQUISE MALLORY

**Appeal from the Circuit Court for Montgomery County**
**No. 63CC1-2023-CR-641  William R. Goodman, III, Judge**

_____

### No. M2025-00095-CCA-R3-CD

_____

The Defendant, Taivaun Marquise Mallory, appeals his Montgomery County Circuit Court conviction of unlawful possession of a firearm by a convicted felon, for which he received a sentence of twelve years' incarceration.  On appeal, the Defendant argues that the trial court erred by denying his motion to suppress a firearm recovered after a traffic stop and that the evidence is insufficient to sustain his conviction.  Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

STEVEN W. SWORD, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Chase T. Smith, Clarksville, Tennessee, for the appellant, Taivaun Marquise Mallory.

Jonathan Skrmetti, Attorney General and Reporter; Ryan Dugan, Assistant Attorney General; Robert J. Nash, District Attorney General; and Kayla M. McBride, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.    FACTUAL AND PROCEDURAL HISTORY

On June 5, 2023, a Montgomery County Grand Jury returned a two-count indictment charging the Defendant with unlawful possession of a firearm by a convicted felon and possession of marijuana related to an August 12, 2022 traffic stop.  On March 4, 2024, the Defendant filed a motion to suppress a firearm recovered from the vehicle he occupied, arguing the State lacked "probable cause or reasonable suspicion" to justify the warrantless stop.  The trial court held a suppression hearing on May 15, 2024.

## A. Motion to Suppress

Clarksville Police Department ("CPD") Officer Lyssed Pacheco testified she worked as a patrol officer during the early morning hours of August 12, 2022. While on patrol around 3:00 a.m., Officer Pacheco received a call for service via the CPD's computer-aided dispatch service advising that a complainant had called 911 to report that "a black male wearing a white tank top" was at Tippers Bar, "had a gun, and was trying to shoot someone." As Officer Pacheco began responding to the complainant's report, the computer-aided dispatch service updated with additional information from the complainant, which stated that the male subject had gotten into a "black Nissan." The complainant also provided the vehicle's license plate number and stated that the vehicle had turned down Peachers Mill Road, driving away from Tippers Bar.

Officer Pacheco testified that Tippers Bar was located on Tiny Town Road and that the only way to drive away from the bar along Peachers Mill Road would be to drive towards "101st." Accordingly, Officer Pacheco began driving towards Tippers Bar along Peachers Mill Road. As she approached the intersection of "101st" and Peachers Mill Road, approximately four to five minutes after receiving the information from the complainant's report, Officer Pacheco saw a black Nissan Altima approaching her from the opposite direction along Peachers Mill Road. As the vehicle drove past Officer Pacheco, she saw that its license plate number was "off by one letter" from the license plate number the complainant provided in his report. Because she believed this vehicle to be the suspect's vehicle, Officer Pacheco initiated a traffic stop.

Officer Pacheco recalled that after she activated her patrol vehicle's blue lights, the black Nissan Altima pulled into the parking lot of a nearby Marathon gas station. Officer Pacheco and other law enforcement officers thereafter ordered the vehicle's occupants to step out of the car. She noted that the vehicle's windows were darkly tinted and that she had been unable to see the occupants until they stepped outside. She described the driver as a woman and identified the passenger as the Defendant. She recalled that the Defendant wore a white tank top and that his appearance matched the complainant's description.

Officer Pacheco testified that she and other law enforcement officers approached the vehicle to ensure that no additional passengers were inside. As they did so, they smelled "the odor of marijuana emitting from the vehicle." She stated that CPD Officer Tyler Weaver[1] subsequently searched the vehicle and discovered a firearm and marijuana.

---

[1] At the time of the traffic stop, Officer Weaver worked for the CPD as a K-9 handler. By the time he testified at the Defendant's trial, Officer Weaver had been promoted to the rank of Sergeant. For consistency, we will refer to this witness by the rank he held at the time of the events giving rise to the Defendant's charges in this case. We intend no disrespect.

- 2 -

On cross-examination, Officer Pacheco agreed that the complainant provided only a general description of the suspect as a "black man" and did not identify him by name. She recalled that the complainant's name was known only as "Marcus." Officer Pacheco testified that after she initiated the traffic stop, she and other members of law enforcement "remained at a distance" with their weapons drawn while the Defendant and the woman exited the vehicle. She also agreed she was unable to confirm who was driving the vehicle before she initiated the stop. She reiterated that she initiated the stop because she believed the vehicle was the same as the one the complainant had described in the 911 call, given that the license plate number closely matched the one the complainant provided. She stated that the Defendant was released with a citation after the traffic stop.

On redirect examination, Officer Pacheco testified that the Defendant was released with a citation following the stop because other officers investigating the complainant's report, who had gone to Tippers Bar, had been unable to locate or contact the complainant. She stated that she and other officers were unaware that the Defendant was a convicted felon until after he was released. She also averred that she was unsure of the traffic stop's duration.

Following this proof, the State argued the Defendant's motion to suppress the firearm should be denied because Officer Pacheco's observations before initiating the traffic stop were consistent with the complainant's report. Specifically, the State noted that the vehicle matched the description the complainant provided; that its license plate was only one digit off from the license plate number the complainant provided; that Officer Pacheco quickly located the vehicle after receiving the complainant's report; and that the complainant's report alleged that one of the vehicle's occupants threatened others with a firearm. Accordingly, the State argued that the traffic stop was legal and that the scope of its intrusion was not excessive.

The Defendant responded that the complainant's information was generic. Specifically, the Defendant noted that the complainant did not identify an alleged victim; the complainant did not allege that the Defendant had displayed a firearm; and the Defendant was not ultimately charged in relation to the alleged conduct at Tippers Bar. Accordingly, the Defendant argued that the traffic stop was illegal and that the scope of its intrusion was excessive.

At the conclusion of the suppression hearing, the trial court, analogizing the evidence presented to that in *State v. Pulley*, 863 S.W.2d 29 (1993), found that although the complainant was an anonymous informant, the information he provided was sufficiently descriptive and verified by Officer Pacheco before the initiation of the traffic stop. Accordingly, the trial court denied the Defendant's motion to suppress. The trial

court entered an order memorializing its denial of the Defendant's motion to suppress on July 22, 2024. The Defendant's trial commenced the same day.

## B. TRIAL

At the Defendant's July 22, 2024 trial, Officer Pacheco testified that she worked as a patrol officer in the early morning hours of August 12, 2022. While patrolling Peachers Mill Road area, Officer Pacheco and other law enforcement officers initiated a traffic stop of a black vehicle. After the vehicle stopped, Officer Pacheco and other officers asked the vehicle's occupants to exit the vehicle. The occupants complied, and Officer Pacheco identified the driver as Brianna Remy and the passenger as the Defendant. Officer Pacheco and other officers subsequently detained and questioned the Defendant and Ms. Remy.

Officer Pacheco testified that, after the Defendant was advised of his *Miranda* rights, he informed her that he possessed a firearm. She recalled that Ms. Remy subsequently consented to a search of the vehicle and of her person. The search of Ms. Remy's fanny pack resulted in the discovery of a "green leafy substance," which Officer Pacheco described as marijuana. She also averred that the Defendant informed her during his interview that he owned the marijuana and had placed it inside Ms. Remy's fanny pack when he saw that Officer Pacheco had initiated the traffic stop.

Officer Pacheco stated that she collected the firearm and the marijuana following the search of the vehicle and Ms. Remy's fanny pack. Officer Pacheco recalled that the Defendant was "very upset" about her seizure of the firearm, and he "stated that he was going to get his gun back."

A video recording of the traffic stop taken from Officer Pacheco's body camera was played for the jury. In a portion of this recording, Officer Pacheco exited a patrol vehicle, placed an item into an evidence bag, and then approached the Defendant, who stood beside an officer near a CPD patrol vehicle. Officer Pacheco asked the Defendant if he owned the marijuana the officers had recovered from Ms. Remy's fanny pack, and the Defendant responded that he did and that he placed the marijuana in Ms. Remy's fanny pack after he saw that Officer Pacheco was following them. The Defendant also stated that he smoked marijuana daily. The Defendant stated that the firearm was registered to Ms. Remy and asked "how" Officer Pacheco could seize it. Officer Pacheco responded that the Defendant had admitted to being a habitual user of marijuana and that the firearm had been "in [his] possession." The Defendant asked how he could "get that gun back," and Officer Pacheco explained that the firearm would need to "go through the court process."

Officer Pacheco then escorted the Defendant to another CPD vehicle, near where another officer stood with Ms. Remy. As they approached, the Defendant called out, "Hey,

get that gun back." Officer Pacheco later advised Ms. Remy that "it would be settled in court whether [she could] get the firearm back or not." The Defendant asked if he could "go to the courthouse tomorrow," and Officer Pacheco responded that he could not. As Officer Pacheco began preparing a citation, the Defendant spoke with other nearby officers, stating, "I'm still going to get my gun back," and "I guarantee I can go buy another one."

On cross-examination, Officer Pacheco recalled that the Defendant stated during his interview that he had not been drinking but advised that he smoked marijuana daily. She averred that the Defendant did not appear impaired during the stop and that she did not ask him to perform any field sobriety tests. She also testified that she confirmed that the firearm recovered from the vehicle was registered to Ms. Remy. However, she noted that the Defendant claimed possession of the firearm during the traffic stop.

CPD Officer Nicholas DeJesus testified that he assisted Officer Pacheco as a backup officer during the August 12, 2022 stop. Officer DeJesus recalled that after officers initiated the traffic stop and the vehicle stopped, he exited his patrol vehicle and instructed the vehicle's occupants to exit the vehicle and walk towards law enforcement. The occupants complied, and Officer DeJesus later identified the vehicle's passenger as the Defendant. Officer DeJesus testified that the Defendant "shout[ed] numerous things" towards law enforcement as he complied with their instructions and continued to do so as he was placed in handcuffs.

Officer DeJesus stated that at several points throughout the traffic stop, the Defendant said he knew what the officers were "looking for" and that it was "in the vehicle." He also recalled that he informed the Defendant that officers were performing field tests on the substance recovered from Ms. Remy's fanny pack to determine if it was marijuana, to which the Defendant responded that "it was real." The Defendant also informed Officer DeJesus that he smoked marijuana daily.

CPD Officer Tyler Weaver testified that he assisted Officer Pacheco as a K-9 handler during the August 12, 2022 traffic stop. Officer Weaver recalled that he arrived shortly after Officers Pacheco and DeJesus initiated the traffic stop. After the Defendant and Ms. Remy exited their vehicle and were detained, Officers Weaver and Pacheco approached the vehicle to ensure there were no additional occupants. As he did so, Officer Weaver noticed the odor of marijuana "emitting from the interior compartment of the vehicle." Around this same time, the Defendant shouted to Officer Weaver that there was an item located in a "book bag" inside the vehicle, which was "registered to her," if Officer Weaver "wanted it."

Officer Weaver testified he walked away from the vehicle and "stood by" while Officer Pacheco questioned Ms. Remy. After confirming that the vehicle was registered

to Ms. Remy and receiving her consent to search it, Officer Weaver approached the driver's side of the vehicle. As he did so, the Defendant "shouted out to [him] that the gun was on the other side." During his search of the vehicle, Officer Weaver recovered a pink backpack from the passenger-side floorboard. Within this backpack, Officer Weaver found a loaded Taurus G2C nine-millimeter pistol and an empty magazine. He stated the firearm had one bullet loaded into its chamber and nine additional bullets in the magazine loaded into the pistol. He also found a nine-millimeter shell casing underneath the driver's seat.

Officer Weaver collected the loaded firearm, the empty magazine, and the shell casing and assisted Officer Pacheco in placing them into evidence bags. Afterwards, Officer Weaver conducted a field test on the green substance recovered from Ms. Remy's fanny pack. He testified that the field test indicated that the substance tested positive for THC, the active ingredient in marijuana, and that it weighed .88 grams.

Officer Weaver further recalled that near the end of the traffic stop, the Defendant argued about the "legality" of the officers' seizing the firearm. Officer Weaver advised the Defendant that he was unlikely to recover the firearm. In response, the Defendant assured Officer Weaver he would get "[his] gun back" and "guaranteed . . . he would just go and buy another gun."

On cross-examination, Officer Weaver testified that he did not collect the pink backpack containing the firearm and the empty magazine into evidence. He also averred that he did not test-fire or disassemble the firearm to determine whether it was functional; he stated that such tests were typically entrusted to the Tennessee Bureau of Investigation, but that the CPD elected not to send the firearm for testing in this case. Officer Weaver recalled that both the Defendant and Ms. Remy claimed to own the firearm at various points during the traffic stop. He stated that although Ms. Remy "made statements about owning the firearm . . . [and] about it being registered to her," the Defendant also referred to it as "[m]y gun" at various points throughout his conversation with Officer Weaver. Officer Weaver testified that after the search, he checked the firearm's serial number and determined it had not been reported stolen.

Officer Weaver testified that at the time of the traffic stop, the CPD tested samples of suspected marijuana using field testing kits which were unable to differentiate between legal CBD and illegal THC. He agreed that the smell, sight, and "everything else associated with marijuana" are also typically present in CBD products and that he "could have been field testing a completely legal substance."

On redirect examination, Officer Weaver noted that he was unable to determine the firearm's owner when he checked its serial number. He reiterated that the Defendant repeatedly referred to the firearm as "[m]y gun" during the traffic stop.

At the conclusion of Officer Weaver's testimony, the State read into the record the parties' stipulation that the Defendant had been convicted of aggravated burglary, a felony crime of violence, on May 26, 2018. The State then rested.

Following a *Momon* colloquy, the Defendant elected not to testify and did not present additional proof. Upon this evidence, the jury convicted the Defendant of unlawful possession of a firearm by a convicted felon and acquitted him of possession of marijuana. The Defendant filed a timely, but unsuccessful, motion for a new trial, and this timely appeal followed.

## II.    ANALYSIS

On appeal, the Defendant argues that the trial court erred by denying his motion to suppress the firearm recovered after the traffic stop and that the evidence is insufficient to sustain his conviction. The State responds that the trial court appropriately denied the Defendant's motion to suppress and that the evidence is sufficient to sustain his conviction. We will consider these issues in turn.

### A.  MOTION TO SUPPRESS

The Defendant argues that the trial court erred by denying his motion to suppress the firearm recovered after the traffic stop because the law enforcement officers lacked reasonable suspicion[2] to justify the traffic stop. He contends that the 911 call leading the CPD to stop the vehicle he occupied came from an anonymous informant known only as "Marcus" who provided generic allegations. He further notes that the informant's allegation that the Defendant was driving the black Nissan seen driving away from Tippers Bar was proven false during the traffic stop. The State responds that the trial court appropriately denied the Defendant's motion to suppress because the traffic stop was supported by reasonable suspicion.

Our standard of review of a trial court's disposition of a motion to suppress evidence is layered. We are bound by the trial court's findings of fact unless the evidence

---

[2] At the suppression hearing, the Defendant argued the traffic stop was unsupported by probable cause, and the State responded that the traffic stop was supported by probable cause. The trial court considered the parties' arguments under that standard. We note, as the parties now acknowledge on appeal, that the appropriate standard for reviewing a warrantless, investigatory traffic stop such as the one in this case considers whether the investigating officer "has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed," which is a lower standard than that required by probable cause. *State v. Bridges*, 983 S.W.2d 487, 492 (Tenn. 1997); *see also Terry v. Ohio*, 392 U.S. 1, 21 (1968).

preponderates against them. Issues of witness credibility, the weight and value of the evidence, and the resolution of conflicting evidence "are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). In light of this deferential standard of review, on appeal, the prevailing party on a motion to suppress evidence "is entitled to the strongest legitimate view of the evidence, as well as all reasonable and legitimate inferences that may be drawn from the evidence." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998). However, we review the trial court's conclusions of law *de novo*. *State v. Keith*, 798 S.W.2d 861, 864 (Tenn. 1998).

Both the Constitution of the United States and the Constitution of Tennessee protect against unreasonable searches and seizures. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated"); Tenn. Const. art. 1, § 7 (providing "[t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures"). Tennessee's protections against unreasonable searches and seizures are identical to those guaranteed by the Fourth Amendment to the Constitution of the United States. *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). A search or seizure performed without a valid warrant is generally presumed to be unreasonable. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *Bridges*, 963 S.W.2d at 490. Any evidence recovered from a warrantless search or seizure is subject to suppression "unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). These exceptions include "search incident to arrest, plain view, stop and frisk, hot pursuit, search under exigent circumstances, and . . . consent to search." *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005).

Also included among the exceptions to the warrant requirement is an investigatory stop, which may be conducted "when the officer has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." *Bridges*, 963 S.W.2d at 492; *see also Terry*, 392 U.S. at 21. This exception has been extended to include investigatory stops of vehicles supported by reasonable suspicion. *State v. Watson*, 354 S.W.3d 324, 329 (Tenn. Crim. App. 2011). Reasonable suspicion is "a particularized and objective basis for suspecting the subject of a stop of criminal activity." *Binette*, 33 S.W.3d at 218. Although reasonable suspicion constitutes a lower standard of proof than the probable cause required to effectuate an arrest, it must be supported by "specific and articulable facts[] that the defendant had committed, or was about to commit, a criminal offense." *State v. Williams*, 185 S.W.3d 311, 319 (Tenn. 2006). In other words, "an officer making an investigatory stop must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *State v. Day*, 263 S.W.3d 891, 902 (Tenn. 2008) (internal quotation marks omitted) (quoting *Terry*, 392 U.S. at 27). In determining whether the investigating officer possessed reasonable

suspicion to justify an investigatory stop, the court must consider the totality of the circumstances, including the officer's "objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders," *State v. Norwood*, 938 S.W.2d 23, 25 (Tenn. 1996) (citing *United States v. Cortez*, 449 U.S. 411, 417-18 (1968)), as well as the officer's "personal observations and rational inferences and deductions." *State v. Watson*, 354 S.W.3d 324, 329 (Tenn. 2011).

Reliability concerns arise in cases involving an investigating officer's action based upon information conveyed by an anonymous informant. *State v. Wilhoit*, 962 S.W.2d 482, 487 (Tenn. Crim. App. 1997); *see also Florida v. J.L.*, 592 U.S. 266, 270 (2000) ("[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.") (citing *Alabama v. White*, 496 U.S. 325, 329 (1990)). Reasonable suspicion based upon information conveyed by an anonymous informant "is dependent upon both the content of information possessed by police and its degree of reliability." *State v. Williamson*, 368 S.W.3d 468, 475 (Tenn. 2012) (quoting *White*, 496 U.S. at 330). Accordingly, before a motor vehicle may be legally detained upon such information, there must be proof of both the basis of the informant's knowledge of the conveyed information and the informant's credibility. *State v. Hanning*, 296 S.W.3d 44, 49 (Tenn. 2009) (citing *Day*, 263 S.W.3d at 903). "[A]ny deficiencies in demonstrating reliability based upon this test can be cured by an investigating officer's independent corroboration of the anonymously provided information." *Hanning*, 296 S.W.3d at 49 (citing *Wilhoit*, 962 S.W.2d at 487). Additionally, when the informant "reports an incident at or near the time of its occurrence, a court can often assume that the report is first-hand, and hence reliable." *Pulley*, 863 S.W.2d at 32. This contemporaneity, "coupled with an officer's verification of details of the caller's observations shortly after receiving the call, can be sufficient to satisfy the basis of knowledge prong of our inquiry." *Hanning*, 296 S.W.3d at 50 (citing *Wilhoit*, 962 S.W.2d at 487-88).

To facilitate our review of the Defendant's claim that his right against unreasonable searches and seizures was violated, we first consider at what point he was seized. An individual is seized when "an officer, by means of physical force or show of authority, has in some way restrained the liberty of [the] citizen." *State v. Williams*, 185 S.W.3d 311, 316 (Tenn. 2006) (quoting *Terry*, 392 U.S. at 19 n. 16). "If a reasonable person would have believed that he was not free to leave or to otherwise terminate the encounter in view of the surrounding circumstances, a seizure has occurred." *Williamson*, 368 S.W.3d at 475 (internal quotation marks omitted) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion)). The record demonstrates, and the parties agree, that the Defendant was seized when Officer Pacheco and other law enforcement officers initiated the traffic stop. Officer Pacheco testified that after she saw the black Nissan Altima driving along Peachers Mill Road bearing a license plate number that closely matched the number

the complainant provided, she activated her patrol vehicle's blue lights. After the black Nissan Altima stopped in the parking lot of the Marathon gas station, Officer Pacheco and other officers exited their patrol vehicles. They ordered the vehicle's occupants to exit. As an occupant of the vehicle, the Defendant was seized when Officer Pacheco activated her patrol vehicle's blue lights to initiate the traffic stop. *See Williamson*, 368 S.W.3d at 476 ("[A] show of authority [by the police]—the activation of the blue emergency lights—from which a reasonable person would not have felt free to leave qualifies as a seizure.") (internal quotation marks omitted) (quoting *Williams*, 185 S.W.3d at 317.

We next consider whether reasonable suspicion supported the seizure. At the suppression hearing, Officer Pacheco testified that while she was on patrol around 3:00 a.m. on August 12, 2022, she received a call for service via the CPD's computer aided dispatch service advising that a complainant, identified only as "Marcus," had called 911 to report that "a black male wearing a white tank top" was at Tippers Bar, "had a gun, and was trying to shoot someone." The complainant also reported that the suspect entered a black Nissan Altima and drove away from Tippers Bar along Peachers Mill Road. The complainant further provided the vehicle's license plate number. Officer Pacheco testified that the only way to drive away from Tippers Bar along Peachers Mill Road would be to drive towards "101st," so she began driving towards the intersection of those two roads. Approximately four to five minutes later, she saw a black Nissan Altima approaching her from the opposite direction along Peachers Mill Road; as it did so, she noted that the license plate number was "off by one letter" from the license plate number the complainant provided in the 911 call. Although she was unable to see the vehicle's occupants because the vehicle's windows were darkly tinted, she nevertheless believed this vehicle to be the same vehicle the complainant had described, so she initiated the traffic stop.

Although the complainant's anonymity raises concerns of reliability, those concerns are allayed by Officer Pacheco's independent verification of the complainant's allegations. *See State v. Luke*, 995 S.W.2d 630, 638 (Tenn. Crim. App. 1998) ("The officer does not have to corroborate every detail of the anonymous informant's tip, but he or she must corroborate more than a few minor aspects, especially if they are not criminal in nature."). The complainant advised that the suspect in this case entered a black Nissan shortly after "trying to shoot someone" at Tippers Bar and drove away along Peachers Mill Road. The complainant also identified the vehicle's license plate number. Officer Pacheco began moving in that direction, and within minutes of receiving the complainant's report, she saw a black Nissan Altima driving in the opposite direction, bearing a license plate one digit off from the number the complainant provided. The officer also noted that the location and timing of her first observation of the Nissan were consistent with a car leaving Tippers bar at the time of the 911 call. This independent verification lends reliability to the complainant's allegations. *Id*.; *see also State v. Kea*, No. E2019-00890-CCA-R3-CD, 2021 WL 795254, at *12 (Tenn. Crim. App. Mar. 2, 2021) (finding reasonable suspicion to

support a traffic stop based on an officer's observation of a vehicle which matched the description provided by an informant, was located in close proximity to the alleged crime, was found in a short period of time between the informant's report, and where the level of danger was apparent based upon the informant's allegations), *perm. app. denied* (Tenn. June 9, 2021). Furthermore, we note that the complainant advised that the suspect was armed and had recently been "trying to shoot someone" and that "[t]he gravity of the perceived harm is a crucial element in addressing the reasonableness of an investigative *Terry* stop." *Pulley*, 863 S.W.2d at 33. Accordingly, we conclude that the totality of the circumstances in this case indicates that the traffic stop was supported by reasonable suspicion. The trial court did not err by denying the Defendant's motion to suppress.

## B. SUFFICIENCY OF THE EVIDENCE

The Defendant also argues that the evidence adduced at trial is insufficient to sustain his conviction of unlawful possession of a firearm by a convicted felon. He contends that the "sole basis of the conviction" came from his own statements that he possessed the firearm recovered from the vehicle; that the officers "passed on the opportunity to have the firearm tested for [his] fingerprints"; and that "the vast number of inconsistencies in the proof should have led a reasonable juror to find him not guilty." The State responds that the evidence is sufficient.

"Findings of guilt in criminal actions . . . shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). The standard of appellate review on a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citations omitted); *see also State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *see also State v. Thomas*, 687 S.W.3d 223, 249 (Tenn. 2024) (citing *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000)). "On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom." *State v. Wilson*, 211 S.W.3d 714, 718 (Tenn. 2007) (citing *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999)). "We do not reweigh the evidence . . . because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury as the trier of fact." *State v. Curry*, 705 S.W.3d 176, 183 (Tenn. 2025) (citations omitted). The same standard of review applies "whether the conviction is predicated on direct or

circumstantial evidence, or a combination of both." *Williams*, 558 S.W.3d at 638 (first citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); and then citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977)).

As relevant here, "[a] person commits an offense who unlawfully possesses a firearm" and "[h]as been convicted of a felony crime of violence." Tenn. Code Ann. § 39-17-1307(b)(1)(A). Possession may be generally proven through proof of actual or constructive possession. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). While actual possession refers to physical control over an item, constructive possession requires only that a defendant have the power and intention . . . to exercise dominion and control over the item allegedly possessed." *State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014) (internal quotation marks omitted) (quoting *State v. Robinson*, 400 S.W.3d 529, 534 (Tenn. 2013)). Constructive possession may be proven by circumstantial evidence, and whether a defendant constructively possessed contraband depends on the totality of the circumstances. *Robinson*, 400 S.W.3d at 534 (citing Tenn. Code Ann. § 39-17-419).

At the conclusion of the State's case-in-chief, the Defendant stipulated that he was convicted of aggravated burglary, a felony crime of violence, on May 26, 2018. A defendant's stipulation is sufficient to establish that he or she had been previously convicted of a felony crime of violence for the purposes of Code section 39-17-1307(b)(1)(A). *See State v. Hurn*, No. E2022-01192-CCA-R3-CD, 2023 WL 7001621, at *2 (Tenn. Crim. App. Oct. 24, 2023) ("Considering the parties' stipulation that the [d]efendant had been convicted of a felony crime of violence, a reasonable juror could have found all the essential elements of the offense beyond a reasonable doubt)*, perm. app. denied* (Tenn. Apr. 11, 2024).

We next consider whether the proof was sufficient to establish the Defendant's possession of the firearm. Viewed in the light most favorable to the State, the evidence adduced at trial demonstrated that the Defendant was seated in the passenger's seat of the vehicle when Officer Pacheco initiated the traffic stop. After he was handcuffed and Officer Weaver began searching the vehicle, the Defendant advised that a firearm was located near the passenger's seat. Officer Weaver thereafter recovered a pink backpack containing a loaded Taurus G2C nine-millimeter pistol and an empty magazine stored underneath the passenger's seat. Although the firearm was registered to Ms. Remy, the Defendant described it as his firearm and repeatedly asked when he would be able to retrieve it. The totality of the circumstances, including the Defendant's acknowledgment of the firearm's presence in the vehicle, his directing Officer Weaver as to where to find the firearm, his close proximity to the firearm prior to his arrest, and his declarations of an ownership interest in the firearm, provides sufficient evidence from which a rational jury could infer the Defendant's possession of the firearm. *See State v. Treadway*, No. E2024-00608-CCA-R3-CD, 2025 WL 252671, at *5 (Tenn. Crim. App. Jan. 21, 2025) (finding,

- 12 -

notwithstanding waiver, the evidence sufficient to establish that the defendant, a convicted felon, possessed firearms when he responded "I have them in the living room" when asked if he had any firearms in his home), *no perm. app. filed*; *State v. Hart*, No. W2023-00122-CCA-R3-CD, 2024 WL 17255, at *4 (Tenn. Crim. App. Jan. 2, 2024) (finding the evidence sufficient to establish the defendant's possession of a firearm despite the defendant's denials of ownership when the firearm was "found between the front passenger's seat (where [the d]efendant was seated) and the center console," which was where the defendant advised the investigating officers the firearm would be found), *no perm. app. filed*.

The crux of the Defendant's arguments to the contrary is that the CPD "passed on the opportunity" to have the firearm tested for the Defendant's fingerprints and that there were certain inconsistencies in the proof. He describes the testifying witnesses as "very specific about some items and vague about other details." These arguments assail the weight of the evidence and the credibility of the witnesses, not the legal sufficiency of the evidence. The jury resolves conflicts in the evidence, determines the weight of the evidence, and evaluates witness credibility as the trier of fact at trial, not the appellate courts. *Curry*, 705 S.W.3d at 183. The Defendant is not entitled to relief.

### III. CONCLUSION

Following our review and based upon the foregoing analysis, we affirm the judgment of the trial court.

s/ *Steven W. Sword*
_____
STEVEN W. SWORD, JUDGE